BENJAMIN E. BROWN, In Equity

*vs.*

PHILIP Y. DeNORMANDIE ET ALS, Trustees.

York.    Opinion May 26, 1924.

*The constitutionality of the Mill Act, R. S., Chap. 97, is unquestionably beyond attack, and its validity firmly established.    Under it reservoir dams may be constructed upon non-navigable streams, regardless of the distance of such a dam from the mill to be benefitted by the storage water impounded thereby. Damage to property of another by flowage does not affect the rights granted under the Act, unless such property is an existing mill or mill site on which a mill or mill dam has been lawfully erected and used, the right to maintain which has not been lost or defeated.*

The history of the Mill Act, beginning with the Provincial Act of 1714, continuing through the Act of 1796 of the Commonwealth of Massachusetts, the Act of 1820 of the State of Maine and now expressed in R. S., 1916, Chap. 97, Sec. 1, shows that there has been no legislative narrowing of the granted right to erect dams and to cause flowage thereby, but rather a broadening.

It is too late now to challenge the constitutionality of the Mill Act. Whether its validity rests upon its great antiquity and long acquiescence, or upon the principles of eminent domain or upon the adjustment and regulation of riparian rights on the same stream so as to best serve the public welfare, having regard to the interests of all and to the public good, the fact of its validity is settled.

The Mill Act includes reservoir dams as well as working dams. The reservoir dam conserves, equalizes and renders more uniform the flow to the mill and is obviously within both the letter and the spirit of the Act.

In the instant case the fact that the mills to be benefitted are located eighty miles below the reservoir dam does not affect the question. The fact of distance does not enter into the proposition.

Nor does the point raised by the plaintiff that the stream upon which the reservoir dam is located is not the same stream upon which the defendants' mills are situated. It may or may not bear the same name but that is of no consequence.

The test is not one of terminology but of hydraulic fact, namely, is the reservoir dam situated upon a non-navigable stream, whose stored water in its natural flow to the sea, regardless of intervening forms of water whether stream, or river or lake, and of the names that may have been given to them, passes through and aids in propelling the wheels of mills belonging to the owners of the reservoir dam? If so, such a stream is within the contemplation of the Mill Act whether it requires an hour or a day or a week or longer for the water to reach its destination.

The fact that flowage would destroy or injure an established summer resort business and thus, as the plaintiff argues, favor one branch of industry at the expense of another, does not place the dam outside the Mill Act.

The present statute grants the right to flow the "lands" of any person, and under R. S., Chap. 1, Sec. 6, Paragraph X.,"the word land or lands and the words real estate include lands and all tenements and hereditaments connected therewith and all rights thereto and interests therein." This includes buildings and improvements on the land as well as the land itself.

The only exception is an existing mill or "any mill site on which a mill or mill dam has been lawfully erected and used, unless the right to maintain a mill thereon has been lost or defeated." No other class of private property is exempt from the provisions of the Act.

On report. A bill in equity brought by plaintiff, proprietor of a summer hotel and camps located on the shores of Upper Kezar Lake in Oxford County, seeking to enjoin the defendants as Trustees of Pepperell Manufacturing Company, a voluntary association, having a place of business in Biddeford in York County, from constructing a reservoir dam across Kezar Lake outlet, a stream not navigable, upon land by them owned, for the purpose of storing water for furnishing power for their mills situated on the same waters at Biddeford eighty miles below. The plaintiff contended that the defendants had no right to erect a storage dam for the use of their mills located at such a distance from the dam, because the mills are not such mills as the Mill Act contemplates being so far distant from the dam, and that the construction of such a dam would result in

raising the water above the natural condition of the lake for a part of the season and then withdrawing the water for the purpose of operating the mills would result in great damage not only to his property on the shore of the lake, but to that of others, used as summer resorts, which is of great value to the State, and hence be contrary to public policy. Defendants contended that they had a right, under the Mill Act, to erect such a dam at such a place for the purpose of storing water for furnishing power to operate their mill at Biddeford. A hearing was had and by agreement of the parties the cause was reported to the Law Court to determine the facts and the rights of the parties upon so much of the evidence as was legally admissible. Injunction denied. Bill dismissed with costs.

The case is fully stated in the opinion.

*Frederick R. Dyer and Hastings & Son,* for plaintiff.

*William B. Skelton, Walter L. Gray and Burton E. Eames,* for defendants.

SITTING: CORNISH, C. J., PHILBROOK, DUNN, WILSON, DEASY, JJ.

CORNISH, C. J. The question for decision is: Shall an injunction be granted to restrain the defendants from building a reservoir dam upon their own land across a stream not navigable, for the purpose of storing a head of water for their mills situated eighty miles below on the same waters?

The pertinent facts should first be stated. The plaintiff is the proprietor of a summer hotel known as Brown's Camps, located upon the shore of Upper Kezar Lake, which for convenience will be called Kezar Lake. The defendants in their capacity as Trustees of the Pepperell Manufacturing Company, a voluntary association, own and operate certain water mills at Biddeford on the Saco River. They own two dams from which water is conducted directly to the wheels of the mills. These dams have a developed head of seven and thirty feet respectively. They own developed and undeveloped water power at Union Falls on the Saco River above Biddeford, where electricity is now generated and transmitted to Biddeford to supplement the water power there, and other mill privileges and dam sites on the Saco and its tributaries, among them being the one in question located on the outlet of Kezar Lake at a point called the Harbor and known as the Thompson Mill privilege. Kezar Lake is a great pond

situated in the town of Lovell, out of which flows a small non-navigable stream known as Kezar Lake outlet, upon which the Thompson privilege is situated at a distance of about two miles from the Lake itself following the course of the stream. This outlet stream flows into or joins the Charles River and these two combined streams flow into what is known as the old Saco River, the three streams combined then flow on to what is locally known as the New Saco River, and thence to the defendants' mills. The terminology of the various waters is unimportant. They all form a part of the Saco waters which finally propel the wheels of the defendants' mills. They are but different sections of a continuous body of water from the outlet of Kezar Lake to the sea.

The proposed dam on Kezar Outlet occupying the site of the old Thompson dam, is to be five feet in effective height from the apron of the old dam as formerly located, and will consist of four feet in height of permanent dam and one foot of flashboards. This would raise the waters of Kezar Lake 2.67 feet above mean summer level and is expected to create from three hundred million to three hundred and sixty million cubic feet of storage. The defendants hold title to flowage rights to a considerable extent on Kezar Lake which were acquired by their predecessors as early as 1879, all the deeds being recorded in that year.

The plaintiff acquired land on the easterly shore of the Lake by several deeds about the year 1900, erected and has maintained a summer hotel there for twenty-two seasons, and has now a plant of some thirty buildings accommodating about one hundred guests. The proposed increase in height of the water is not expected to overflow the plaintiff's premises, but would come so close to the surface that he claims it would flow out the sand beaches now valuable for bathing purposes, would in time destroy the trees near the shore, interfere with the process of filtration in the septic tanks erected near the shore for the purpose of taking care of the sewage, render the surroundings unsightly and unsanitary and otherwise injure or destroy his property and business.

So much for the general situation.

The plaintiff seeks remedy by injunction to prohibit the erection of the storage dam, which the defendants claim the legal right to erect and maintain under the Mill Act, and rests his contention on two grounds which as stated by himself are:

First: That the proposed dam is not within the Mill Act, because "there is no mill near or adjacent to it or within a sufficient distance so that it can be said that the dam is directly and obviously subservient to the purpose of carrying said mill;"

Second: That the proposed dam is not protected by the Mill Act because its erection "would destroy an established business of great value to the State itself, and would thus commit the State to the policy of favoring one branch of industry at the expense of another."

The decision of these questions necessitates a reexamination of the history and scope of the Mill Acts which have been in existence as long as the State itself and for a long time prior thereto, and of our decisions thereunder.

## 1. The Mill Acts.

As early as 1714, the Province of Massachusetts Bay enacted a law for the benefit of water mills in the following terms with the preamble, which shows the purpose of the legislation:

"Whereas it hath been found by experience, that when some persons in this province have been at great cost and expenses for building of mills serviceable for the publick good and benefit of the town, or considerable neighborhood in or near to which they have been erected, that in raising a suitable head of water for that service it hath sometimes so happened that some small quantity of lands or meadows have been thereby flowed and damnified, not belonging to the owner or owners of such mill or mills, whereby several controversies and law suits have arisen,

For prevention whereof for the future, Be it therefore enacted by his excellency the Governor, Council and Representatives in general court assembled, and by the authority of the same, that where any person or persons have already, or shall hereafter set up any water mill or mills upon his or their own lands, or with the consent of the proprietors of such lands legally obtained, whereupon such mill or mills are or shall be erected or built, that then such owner or owners shall have free liberty to continue and improve such pond for their best advantage without molestation." The Act then provides for the summoning of a jury and the determination of the yearly damage. Province Laws, Chapter 111.

It will be noted that this original Province Act was in very general terms. It did not limit the location of dams to streams not navigable, nor did it protect mills and mill sites already existing on the same stream. Land was then of little value compared with the usefulness of grist, saw, carding and fulling mills to the pioneer settlers, and the duplication of mills on the same stream was not anticipated.

After the establishment of the Commonwealth of Massachusetts, and while the territory now embraced within the limits of the State of Maine was a part of it, the Legislature passed "an act for the support and regulation of mills" which provided:

"That where any person hath already or shall erect any water mill on his own land or on the land of any other person, by his consent legally obtained, and to the working of such mill it shall be found necessary to raise a suitable head of water; and in so doing any lands shall be flowed not belonging to the owner of said mill, it shall be lawful for the owner or occupant of such mill to continue the same head of water to his best advantage, in the manner and on the terms hereinafter mentioned." Then follow provisions as to the appraisal, security and recovery of the annual damage. Mass. Laws of 1796, Chapter 74.

It is unnecessary to trace the statutes in Massachusetts farther. Let us turn to the history of the Mill Act in Maine.

The first section of the Mill Act of 1821, Public Laws, 1821, Chapter 45, is an exact transcript of the Massachusetts Act of 1796, before quoted. The words dam, or mill dam, or reservoir dam are not mentioned in this Act of 1821. The mill owner is given the right to raise a suitable head of water to meet his necessities and he is to continue the same head to his best advantage. These words have a broad meaning and would seem to imply the use of a reservoir dam as well as a working dam if thereby the mill owner is enabled to raise a suitable head of water and continue the same to his best advantage. No prohibition against flowing existing mills or mill sites upon the same stream was created.

The revision of 1841 recast the language in these words: "Any man may erect and maintain a water mill and a dam to raise water for working it, upon and across any stream that is not navigable upon the terms and conditions and subject to the regulations hereinafter expressed." R. S., 1841, Chap. 126, Sec. 1. It will be observed

that this act for the first time expressly mentions a dam, inserts a new condition that such dam shall be upon and across a stream not navigable, and in Section 2 provides that no dam shall be built to the injury of an existing mill or mill site as therein specified. It omits the proviso as to necessity. That element seems to have disappeared.

In the revision of 1857 the word "dam" becomes plural, R. S., 1857, Chap. 92, Sec. 1, and has so remained for a period of nearly seventy years and through all the intervening revisions. R. S., 1871, Chap. 92, Sec. 1; R. S., 1883, Chap. 92, Sec. 1; R. S., 1903, Chap. 92, Sec. 1, and R. S., 1916, Chap. 97, Sec. 1, the words of the present statute being: "Any man may on his own land, erect and maintain a water mill and dams to raise water for working it upon and across any stream not navigable . . . . upon the terms and conditions and subject to the regulations hereinafter expressed." Then follow the provisions as to protection of other mills and mill sites on the stream, and the procedure by complaint for obtaining damages.

This brief history of our Mill Acts for more than two hundred years shows that there has been no legislative narrowing of the granted right to erect dams and to cause flowage thereby, but rather a broadening. The development of our water power by private initiative is the settled policy of the State, and the application of the right has broadened with industrial expansion.

2. CONSTITUTIONALITY.

It is too late now to challenge the constitutionality of the Mill Act. Whether its validity rests upon its great antiquity and long acquiescence, *Jordan* v. *Woodward*, 40 Maine, 323, or upon the principles of eminent domain, *Ingram* v. *Maine Water Co.*, 98 Maine, 566, or upon the adjustment and regulation of riparian rights on the same stream, so as to best serve the public welfare, having due regard to the interests of all and to the public good, *Otis Co.* v. *Ludlow Mfg. Co.*, 186 Mass., 89; *Duncan* v. *New England Power Co.*, 225 Mass., 155; *Head* v. *Amoskeag Mfg. Co.*, 113 U. S., 9, the fact of its validity is settled. For a general discussion see *State* v. *Edwards*, 86 Maine, 102; *Brown* v. *Gerald*, 100 Maine, 351; *Opinion of Justices*, 118 Maine at 516.

### 3. RESERVOIR DAMS.

The Mill Act includes reservoir dams as well as working dams. The statute itself mentions neither class. It simply says dams to raise water for working a mill. It does not specify where they shall be located. Any dam that will raise water for working the mill answers the statutory requirement, and a reservoir dam comes within that class as certainly as a working dam. The reservoir dam conserves, equalizes and renders more uniform the flow to the mill and is obviously within both the letter and the spirit of the act, provided of course, its ownership is the same as that of the mill to be benefitted.

The latest word from the Legislature confirms this view. The Act of 1919 creating the Maine Water Power Commission provided that "every person, firm or corporation before commencing the erection of a dam for the purpose of developing any water power in this State or the creation or improvement of a water storage basin or reservoir for the purpose of controlling the waters of any of the lakes or rivers of the State shall file with said Commission for its information and use copies of plans for the construction of any such dam or storage basin or reservoir, and a statement giving the location, height and nature of the proposed dam and appurtenant structures and the estimated power to be developed thereby; and in case a dam is to be constructed solely for the purpose of water storage and not for the development of a water power at its site, plans and statements shall be filed with the Commission showing the extent of the land to be flowed, the estimated number of cubic feet of water that may be stored and the estimated effect upon the flow of the stream or streams to be affected thereby." Public Laws, 1919, Chap. 132, Sec. 9.

This interpretation of the Act has been continuously upheld in the decisions of our court.

The question first arose more than eighty years ago in *Nelson* v. *Butterfield*, 21 Maine, 220. In that case the mill owners below had erected a reservoir dam as early as 1817 at the foot of Twelve Mile Pond, now called China Lake, in the County of Kennebec, to store water for the use of the several dams and mills on different parts of the outlet stream running from the Lake to the Sebasticook River, a distance of about six miles. The defendants at the time of bringing the complaint owned and operated the first dam which was seventy-five rods below the reservoir dam. Upon a complaint brought by a

littoral proprietor on the lake for flowage between May 1, 1830, and
August 8, 1833, counsel for defendants requested the court to charge
the jury among other things that "a complaint for flowage under the
statute would not lie, for a reservoir dam, used only to save the water
and not to create a head and fall of water to carry the mills"; but
the court, Chief Justice Weston presiding, declined to give this
request, and instructed the jury: "that said stone dam, although
it were used only to save the water and not to create a head and fall
for the mills, was such a dam as was embraced within the statute,
for the erection and maintenance of which a person would be liable
to this process." The Law Court sustained this ruling in this unmis-
takable language: "Another question is, whether the dam, which
retains the water of the Twelve Mile Pond and causes it to overflow
the land of the complainant is protected by the provisions of the
statutes. It is only necessary to raise and preserve the water for
the use of the mills on the stream, when the water which usually
flows in it has become diminished. And it may be inferred from the
report that it is necessary to enable the owners to work their mills at
all times during the year. The first section of the statute does not
prescribe the manner in which a suitable head of water is to be raised.
It only requires that it should be found necessary to raise it. The
means by which the object is to be accomplished appear to have been
left to the mill owner. There is nothing in the statute to prohibit
him from doing it by one or more dams situated at a greater or lesser
distance, or by a dam on or near to which no mill is erected. The
water may be raised and retained and conducted in a channel to any
distance from the dam for use at the mill, and the owner is by the
statutes authorized 'to continue the same head of water to his best
advantage.' The design appears to have been to authorize the mill
owner to raise a suitable head of water and to control and use it in
such a manner as to enable him to employ his mill to the best
advantage during the whole year. And that he should be restricted
only by the jury or commissioners who are authorized to find during
'what portion of the year the said lands ought not to be flowed.' . .
The only proper question therefore for consideration is, whether it
be necessary that the waters of the pond should be raised and caused
to flow over their natural bounds for the purpose of raising a suitable
head for the use of the mills. And the facts reported lead to the
conclusion that it would be necessary to enable the owners to work
their mills to advantage during certain portions of the year."

It will be noted that the element of necessity existed under the statute of 1821 which was in force when *Nelson* v. *Butterfield* arose, and was therefore considered by the court. But this element of necessity was omitted in the revision of 1841, and the scope of the act was thereby broadened.

The question of a reservoir dam being within the Mill Act remained apparently as settled under *Nelson* v. *Butterfield* from 1842, when that case was decided, until 1881, a period of almost forty years, when it again was raised in *Dingley* v. *Gardiner et als, Trustees*, 73 Maine, 63. That was an action on the case to recover damages for the flowage of the plaintiff's meadow in Richmond by reason of the defendants' reservoir dam on the Cobbosseecontee stream in Gardiner. There were seven mill dams below on this stream, two of which, and the mills on the same, were owned by the defendants. The defendants claimed that this action at common law could not be maintained, because the reservoir dam causing the flowage was within the Mill Act and the plaintiff's sole remedy was by complaint under that act. The court so held and tersely upheld the defendants contention: "The reservoir dam is within the Mill Act. It has ever been so held. The statute authorizes the erection of dams. It does not restrict the mill owner to one dam. *Bates* v. *Weymouth Iron Co.*, 8 Cush., 548; *Nelson* v. *Butterfield*, 21 Maine, 220. 'Reservoir dams' remarks Colt, J., in *Norton* v. *Hodges*, 100 Mass., 242, 'for the benefit of mills upon the same stream have been held to come within the protection of the statute; and this, although such a dam may not be immediately connected with or very near the mill.' The defendants are mill owners as well as dam owners. They are within the language and object of the statute. That others may be benefited by the water saved by the reservoir dam does not in the least relieve them from liability. They none the less own the dam, which injures the plaintiff by causing back water, and the mills which are benefited by the water reserved. The dam is directly subservient to the purpose of driving the defendants' mills and increasing their water power though other dams and mills may be nearer the reservoir dam." See also *Gardner* v. *Gibbs*, 70 Maine, 243, and *Monmouth* v. *Plimpton*, 77 Maine, 556, where the right to maintain a reservoir dam was involved and assumed.

The Massachusetts Court have uniformly held the same doctrine. *Wolcott* v. *Upham*, 5 Pick., 292; *Shaw* v. *Wells*, 5 Cush., 537; *Bates*

v. *Weymouth Iron Co.*, 8 Cush., 548; *Drake* v. *Woolen Co.*, 99 Mass., 574; *Norton* v. *Hodges*, 100 Mass., 241.

In view of this array of authority the learned counsel for plaintiff, while not expressly denying that a reservoir dam may be within the Mill Act, contend that the reservoir dam in this case is not within the Act because there is no mill near or adjacent to it or within a sufficient distance so that the dam is directly and obviously subservient to the purpose of carrying the mill. In other words they practically admit by their contention that a reservoir dam within a short distance from the mill may be within the act, but one located on the same waters fifty or eighty miles above could not be, reducing the question to one of mileage, and asking the court to fix the limit and to say thus far and no farther.

This is wholly specious. The right to build and maintain the dam is based upon its holding back the water that would otherwise run to waste in times of flood, storing it and letting it down to the owners' mills when needed in times of low water, thereby increasing the effective water power of the stream and enhancing production. The fact of distance does not enter into this proposition. Nor does the point raised by the plaintiff that the stream upon which the reservoir dam is located is not the same stream upon which defendants' mills are located. It may or may not bear the same name but that is of no consequence. It may be tributary water. The test is not one of terminology but of hydraulic fact, namely, is the reservoir dam situated upon a non-navigable stream, whose stored water in its natural flow to the sea, regardless of intervening forms of water, whether stream or river or lake and of the names that may have been given to them, passes through and aids in propelling the wheels of mills belonging to the owners of the reservoir dam. If so, such a stream is within the contemplation of the Mill Act whether it requires an hour or a day or a week or longer for the water to reach its destination. Such a dam thus located and thus owned meets the purpose of the existing Act and complies with both its spirit and its terms.

True, when the Act of 1821 was passed the idea of a reservoir eighty miles above the mill probably did not enter the legislative mind. But that argument has little force. It is doubtless true that small mills, suited to the actual local necessities of the pioneer settlement, were then contemplated, such as carding and fulling mills, grist mills or saw mills. But the scope of the Act has never been thus

limited. Mills for the manufacture of cotton goods, woolen goods, pulp and paper have increased and multiplied and the manufacturing industries of our State have been built up in absolute reliance upon this broad construction of the Act. Millions in capital have been invested, industrial cities and towns of considerable size have grown up, and tens of thousands of employees are dependent upon these industries for their livelihood. As the Massachusetts Court remarked in answer to a somewhat similar suggestion nearly a hundred years ago: "The encouragement of mills has always been a favorite object with the legislature, and though the reasons for it may have ceased the favor of the legislature continues." *Wolcott Woolen Mfg. Co.* v. *Upham*, 5 Pick., 292.

The Mill Act speaks as of today and the individual who or the corporation which can meet its requirements, as do the defendants in the case at bar, can take advantage of its provisions and aid in building up the industries of the State as the State evidently wishes should be done. Moreover, to ask the court to set an arbitrary limit to the location of a reservoir dam above the benefitted mill is to ask not judicial action on our part but legislative action, a request with which we cannot comply. Shall it be at one mile or ten or one hundred? That is beyond our power. The first objection of distance, which is raised not by the statute nor by any decision, but by the plaintiff, cannot be sustained.

The second objection must meet the same fate. It seeks to place the dam in question outside the Mill Act because the flowage would destroy or injure an established summer resort business, and thus, as the plaintiff argues, favor one branch of industry at the expense of another.

Here again we must go to the statute to ascertain what power is given and what exceptions are made. As to the power given, it is to flow the "lands" of any person, and the only exception is an existing mill or "any mill site on which a mill or mill dam has been lawfully erected and used, unless the right to maintain a mill thereon has been lost or defeated."

The word "lands" is not confined to field or meadow. Under Rules of Construction, R. S., Chap. 1, Sec. 6, Par. X., "the word 'land' or 'lands' and the words 'real estate' include lands and all tenements and hereditaments connected therewith, and all rights thereto and interests therein." This includes buildings and improve-

ments on the land as well as the land itself. The only exception to this broadly inclusive term is other manufacturing industries on the same stream. This exception did not arise until the revision of 1841, at the same time when the element of necessity was dropped out. The evident purpose of both the omission of necessity and the addition protecting other mills on the same stream was the encouragement of manufacturing industries and the injury of none. No other class of private property is exempt from the provisions of the Act. The maxim "Expressio unius est exclusio alterius" may be pertinently invoked. The court cannot arbitrarily by injunction prevent the flowage of any class of property which the statute permits.

In 1881 "a new and independent act of legislation," *Norris* v. *Pillsbury*, 74 Maine, 67, was passed, providing for the assessment of damages in gross instead of yearly damages if the mill owner so elects. Public Laws, 1881, Chap. 88; R. S., 1916, Chap. 97, Sec. 10. It is common knowledge that since the passage of this act damages in gross have been frequently assessed and paid for injury to dwellings and other buildings standing on the flowed property, and certainly a summer hotel with its annexes is no more sacred than a home.

The latest word on this subject from the Legislature is the Act of 1921, which provides in substance that when any person or corporation shall have decided to erect a dam across a non-navigable stream either under the Mill Act or under a special act of the Legislature, and shall have filed the plans and specifications required by Public Laws, 1919, Chap. 132, Sec. 9, already referred to, and it appears that standing timber or other valuable property upon the land to be flowed will constitute a menace to persons below on the stream, authority may be given by the Supreme Judicial Court in equity upon proper proceedings to remove and sell such timber or other valuable property, the proceeds to be under the control of the court. This is an explicit and recent recognition of the validity of the common practice of flowing other property than fields or meadows and refutes the contention of the plaintiff.

Our conclusion therefore is that the contemplated acts of the defendants in constructing this reservoir dam are within their legal rights under the Mill Act, that the plaintiff's legal remedy is by complaint under that act and the damages assessed thereunder will stand as full compensation for the damages to his property. He has the same rights as all other littoral proprietors on our lakes; no more, no

less.  He bought the property presumably aware of the liability of flowage.   The defendants bought their flowage rights on some parts of the shore anticipating this dam in the future.   The plaintiff can claim and the defendants must pay full compensation for the land or other property injured or destroyed.   Thus will the rights of both parties be preserved and the purpose of the statute fulfilled.

*Injunction denied.*
*Bill dismissed with costs.*