Matilda Bean, Complainant

*vs.*

Central Maine Power Company.

Bingham Land Company, Complainant

*vs.*

Central Maine Power Company.

Somerset.      Opinion, June 21, 1934.

*Locke, Perkins & Williamson,* for complainants.
*Merrill & Merrill,*
*Perkins & Weeks,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, JJ.
PATTANGALL, C. J., DUNN, J., dissenting.

BARNES, J. On complaints for flowing under R. S., Chap. 106, Secs. 1-38, bills of exceptions to the ruling of the superior court were argued together before the law court.

The erection and operation of Wyman Dam, between Moscow and Pleasant Ridge, in Somerset County, occasioned a material change in the surface level of the Kennebec River above the dam, and flowing of riparian lands on each side, including such lands of both plaintiffs, the Bingham Company land, at the southerly bound of Carrying Place Plantation, west of the river, and the Bean Land, in Carratunk, east of the river and far above the Bingham Company land.

There is no community of interest in the complainants but the lands of each extend to the mid-thread of the river, and the principles involved are identical in the two cases.

Prior to the erection of the dam, on and opposite complainants' lands, the river flowed, in volume affected by seasonal and climatic variations, down a channel, over no natural pitch and affording no site for a mill, as the term is understood in New England.

The contention of plaintiffs is that by the flowing they have suffered loss of current; that the current of which they are deprived is a valuable incorporeal hereditament, incident to their lands, not to be taken from them by another except upon payment of compensation.

In other words, suspension of the enjoyment of the flow of water in a swift current through complainants' lands and the substitution of flow of the same volume of water by imperceptible current is what is complained of.

The flowing is admitted and the problem is to determine what are the factors that go to make up damages.

The parties agree that time and expense will be saved to all if the

rule of compensation may be determined for the guidance of the commissioners, who, under the law, shall determine the same; and complainants admit that neither they nor any of their predecessors in title had, before the building of the dam, taken any steps toward construction of a dam at any point within their respective bounds.

Defendants' position is that the right of an upper riparian owner to raise a head of water on his land is not absolute, but is contingent upon the fact of steps of construction being taken by the upper owner before a lower owner has built and flowed the upper owner's privilege; that if there are, on the same stream two undeveloped power privileges, construction on the lower, which flows and renders useless as a power privilege the upper site, while entailing on the upper owner what may prove to be a loss, does not make the lower owner liable for such loss as may be based on inability to make a profit from development of the upper power privileges.

Industrial development had not advanced in England, at the time of first New England settlement, to the stage of construction of dams for sawing timber or grinding grain by water power. It is said that saw mills driven by water power were in successful operation in New England more than thirty years before an attempt was made to build such in the mother country.

Permanent settlements in the area, now the State of Maine, were established before enactments of the Massachusetts Bay Colony were accepted and recognized as the law of this locality.

On Captain John Mason's plantation, in what is now York County, in this state, a saw mill was built in 1631. See Ridlon's "Saco Valley Settlements and Families," p. 191.

Such rules of English common law as the early colonists adopted became the common law of the land of the colonists, together with other laws deemed by them to be of prime importance and adapted to the needs of the inhabitants of the new land.

Under the common law of England the bed of a river was the property of the state; a riparian proprietor owned only to low water mark on the shore of a river. At the time of the first settlements in the new world the chief service of a river was as a highway.

Obstructions on a river bed were abatable if proven a nuisance to the public.

In England there was recognized the exception that an obstruction erected by the sovereign was not abatable.

This exception was adopted in New England, with the further exception that dams might be erected, and mills driven by water power might be maintained, as of public use and benefit. Hence the expression mill privilege.

Under the common law as recognized by Massachusetts Bay Colony, a proprietor's land, bounded on a stream extended to the mid-thread of the current.

If one owned the banks on both sides of a river, above the reach of the tide, he owned the bed of the stream, and his dam, on his land, could not be prostrated unless by order of Court for the abatement of a public nuisance.

Under the doctrine of reasonable use, common law rights and duties protected and restricted those who would develop a mill privilege, for examples, they had the right, as against the public, to convert a current, valuable to timber men, to a still pond; and the duty not to obstruct a river below the mark to which the tide of ocean flowed.

Experience showed that raising a head of water sufficient for reasonable operation of a mill frequently flowed river banks and adjoining lands beyond the bounds of what the mill man owned or could control by virtue of grant; and controversies and law suits arose. Wherefore the mother colony, in 1714, enacted legislation, the first Mill Act, so far as Maine is concerned, "That where any person or persons have already, or shall hereafter, set up any water-mill or mills, upon his or their own lands, or with the consent of the proprietors of such lands legally obtained, whereupon such mill or mills is or shall be erected or built, that then such owner or owners shall have free liberty to continue and improve such pond, for their best advantage, without molestation."

Then, in harmony with the common law rule that if one man's property is taken, to another's advantage, the taker shall make good the loss, the Act provided for an impartial, "apprisal of the yearly damage done to any person complainant, by flowing his or their land as aforesaid."

A similar act was passed after the establishment of the Com-

monwealth of Massachusetts, and by the first legislature of Maine, Public Laws, 1821, Chapter 45.

Then, by R. S., 1841, Chapter 126, our legislature provided: "Any man may erect and maintain a water mill and a dam to raise water for working it upon and across any stream that is not navigable upon the terms and conditions and subject to the regulations hereinafter expressed"; and in the regulations provided by Section 2, "No dam shall be erected to the damage of any mill lawfully existing either above or below it, on the same stream; nor to the injury of any mill site *on which a mill or mill dam shall have been lawfully erected and used,* unless the right to maintain a mill on such last mentioned site shall have been lost or defeated by an abandonment, or otherwise."

Subsequent amendments not vital here, have been made, and the present law, R. S., Chapter 106, prescribes: "Any man may on his own land, erect and maintain a water mill and dams to raise water for working it, upon and across any stream, not navigable; . . . upon the terms and conditions, and subject to the regulations hereinafter expressed"; retains the clause of exception, Section 2; by subsequent section provides; "Any person whose lands are damaged by being flowed by a mill-dam . . . may obtain compensation for the injury, by complaint to the superior court" etc.; and, if injury compensable in damages is established, by section 9 provides; "The court shall appoint three or more disinterested commissioners of the same county who shall go upon and examine the premises and make a true and faithful appraisement, under oath, of the yearly damages, if any, done to the complainant by the flowing of his lands . . . described in the complaint. . . . They shall also ascertain, determine and report what sum in gross would be a reasonable compensation for all the damages, if any, occasioned by the use of such dam"; and makes provision for collection of such compensation.

The constitutionality of the act is not questioned.

The fact of its validity is settled. *Brown* v. *DeNormandie,* 123 Me., 535, 541, (1924) 124 A., 697.

It is not denied that lands of complainants are flowed by defendant's mill pond, and it is admitted that damages are to be assessed for flowing the banks and adjacent lands.

But it is urged by complainants that an item of damages to be considered was brought into being because over all that part of the bed of the river that extended to the thread of the current, in its natural state, from lower to upper bounds of each tract described, the level of the river has been raised and the still waters of a mill pond substituted for what was formerly the natural stream, moving "through a narrow valley with a heavy and steady current," to quote from complainant's briefs.

They admit that, "no fall or dam site as the term is usually used" existed on the land of either, and state, "Nor is there any (such) natural head or waterfall at the point where the complainant's land is located above the dam."

In fine, complainants set up what defendant contends is entirely novel, and not maintainable, the inclusion, as an increment of damages, of the flowing of the bed of a non-navigable river where was no mill site, so as to change swift water to pond water.

Obviously the current of the river was stilled.

But defendant contends that this change, if an injury, is not compensable in damages, and further that damages due for flowing lands of complainants are not to be increased because the bed of the river, at some undesignated point in either complainant's land, but not on a mill site, to the thread of the stream, might have served as the site of a dam on which a mill may some day in the future be erected and operated at a profit to the owner.

First, as to procedure.

At the return term, when the complaints were entered in court, defendant challenged them by filing exceptions thereto, alleging that they contain matter impertinent to the issue to be tried.

Defendant contended that in seven particulars the allegations of complaint were not pertinent.

The Court sustained the exceptions and ordered portions of the complaints specified in exceptions expunged; complainants filed bills of exceptions, and, without objection on the part of defendant, demand ruling thereon before proceeding further.

Procedure under the Mill Act is substituted for an action at common law for damages. Though brought at law and not in equity, "the process authorized against them is not as tort feasors, but is rather in the nature of a bill in equity, to obtain redress for

the injury occasioned by the flowage." *Hill* v. *Baker,* 28 Me., 2, 21.

Again, "the process is not an action at law. It is sui generis, in its nature, partaking of some of the elements of a suit at law, but resembling much more a process in equity. It is not commenced by a writ but by a bill of complaint, . . . ﹍

"Viewed in this light, the strict rules of pleading, applicable to suits at law commenced by writs can not apply; but the rules in cases in equity do apply." *Moor* v. *Shaw,* 47 Me., 88; *Miles* v. *United Box Board Co.,* 108 Me., 270, 80 A., 706.

Exceptions to allegations in a bill in equity, as other "Exceptions to bills may be filed within twenty days after return day, and to answers, within ten days after notice that they have been filed, and shall be disposed of by reference to a master, or otherwise, as the court may direct." Equity Rules of the Supreme Judicial and Superior Courts, XIX.

In the cases at bar exceptions to portions of the complaints allege such portions to be impertinent.

"By the settled practice exceptions will lie for impertinence in a bill, answer, or other pleadings . . .

"All matters not material to the suit, or if material, which are not in issue, or which, if both material and in issue, are set forth with great and unnecessary prolixity constitute impertinence." *Camden and Amboy Rd. Co.* v. *Stewart,* 19 N. J. Eq., 343.

"Impertinence in equity pleading signifies that which is irrelevant, and which does not, in consequence, belong to the pleading. The word does not include the idea of offending propriety. *The full significance* of the *word* is found in the expression *not pertinent.*" *Chew* v. *Eagan,* 87 N. J. Eq., 80, 99 A., 611.

By this practice matter that is irrelevant to the material issues is pruned away, and the issues stand forth clear to the view and patent in substance.

The practice is universal; to test damages improperly claimed, *W. U. Tel. Co.* v. *Morrison,* 15 Ala. Apps., 532, 74 So., 88; to bring the complainant within the conditions prescribed by the law relied upon, and to confine his right to recover to that law, *Mining Co.* v. *Chambers,* 20 Ariz., 54, 176 P., 839; that matter of law be declared by the Court, not set up in pleadings, *Carson* v. *Miami Coal Co.,* 194 Ind., 49, 141 N. E., 810; where evidence of the mat-

ters pleaded was not admissible, *McDowell* v. *Grain Co.*, 177 Iowa, 749, 157 N. W., 173, *Stone* v. *Barr*, 111 Kan., 775, 208 P., 624; where averment is evidentiary only; *Smith* v. *Hutcherson*, 202 Ky., 302, 259 S. W., 364; New York law so interpreted, *De St. Aubin* v. *Guenther*, 232 Fed., 411; to expunge matter that is prejudicial, *Case* v. *Ry. Co.*, 107 S. C., 216, 92 S. E., 472, *Gerlach* v. *Gruett*, 175 Wis., 384, 185 N. W., 195.

The practice is approved in this state; "If equity lends her forms of procedure to effectuate the peculiar provisions of the statute in these (flowage) cases, she should be accorded the privilege of applying her rules of pleading in order to obtain equitable and just results." *Hathorn* v. *Kelley*, 86 Me., 487, 490, 29 A., 1108; *Langdon* v. *Pickering*, 19 Me., 214, 216; *Spaulding* v. *Farwell*, 62 Me., 319, 320.

The "conscientious pleader," may be troubled at the intervention of exceptions in an action in law, but as said in *De St. Aubin* v. *Guenther*, supra, "Courts do not, however, value so much as formerly their logical integrity, and, if the result be convenient, no harm is done."

In regular order an appeal taken from any interlocutory decree, in equity, "shall not suspend any proceedings under such decree or order, or in the cause, and shall not be taken to the law court until after final decree." R. S., Chap. 91, Sec. 55; and subsequent section 58, with other provisions, directs, "In all other respects such exceptions shall be taken, entered in the law court, and there heard and decided like appeals. . . . The allowance and hearing of exceptions shall not suspend the other proceedings in the cause."

It is argued that in justice and fairness to all parties the question whether certain allegations in the complaints are not pertinent should be determined at the present stage of the litigation, for the saving of great expenditure of money on both sides, and because the body which must finally determine the amount of damages, very considerable as claimed, the commissioners, will in all probability be in large part laymen, not trained to disregard prejudicial matter that lies on the surface or may seep into the subsoil.

In former cases, as a method of expediency and equity, the statute rule has been treated as directory.

"A question arises whether a bill of exceptions can be heard in

this court before a case in equity comes up for final hearing. Generally it would be an irregular proceeding.

"But as the peculiar character of the present question hardly admits of postponement, if any benefit is to be derived from it by the moving party, we think it would not be an infraction of the rules usually regulating equity proceedings, to give these exceptions a privileged position on the docket.

"It is authorized by the example furnished in *Spaulding* v. *Farwell*, 62 Me., 319." *Stevens* v. *Shaw*, 77 Me., 566, 1 A., 743.

"The rule laid down in *Stevens* v. *Shaw*, 77 Me., 566, 1 A., 743, is that it is irregular to hear exceptions in an equity case before final hearing, and that such hearings should not be allowed unless the question does not admit of delay until then." *Maine Benefit Ass'n* v. *Hamilton*, 80 Me., 99, 13 A., 134.

"It might be questioned as to whether this bill of exceptions was not prematurely brought forward, as the exception was to an interlocutory order and perhaps should not have been entered until the completion of the case, when it might have become unnecessary to prosecute the exceptions. R. S., Chap. 77, Sections 22, 25 (R. S., 1930, Chap. 91, Sections 55, 58). But as the procedure under the act of 1893 (Law and Equity Act, Chap. 217, P. L., 1893), is somewhat anomalous, and as there has already been considerable delay in the case, we think it more in the interests of justice that the questions involved should now be determined, which course is not without precedent in this state, even if it were clear that the exceptions were prematurely brought forward." *Flint* v. *Comly*, 95 Me., 251, 49 A., 1044.

It is held in *Spaulding* v. *Farwell*, supra, that exceptions to the ruling of the single Justice, sustaining exceptions in equity for impertinence, may be heard by the law court before the cause is carried to the stage of final disposition.

From the "peculiar character" of the issue, *Stevens* v. *Shaw*, supra, and because we agree with counsel for all parties here that decision now will be "more in the interests of justice," *Flint* v. *Comly*, supra, we hold that we may now determine this issue.

The ruling of the learned Justice below takes from the consideration of the commissioners on damages, hereafter to be appointed, matters of greatest importance to complainants.

They appear in the allegations of each complaint; 1st: "that there was inseparably attached to said land of the said complainant as an incorporeal hereditament and appurtenance inseparable from said land, including the area so overflowed, the right to the swift current and falls of the Kennebec River running by, over and along said land of said complainant; that said right to current, inseparable from said complainant's land as aforesaid was very valuable and possessed the characteristics of potential but undeveloped horse power;"

2nd: "said potential and undeveloped horse power possessing the value of Fifteen Dollars at least per horse power;"

3rd: "that prior to the erection of said mills and dams by said Central Maine Power Company the complainant's said land possessed as an inseparable part thereof an element of value consisting of hundreds of potential undeveloped horse power worth at least Fifteen Dollars per horse power for the future production of power, hydro-electric or otherwise,"

4th: "which said amount the said Central Maine Power Company has paid for said right to current appurtenant and attached to other land similarly situated on said Kennebec River as the said land of the said complainant;"

5th: "that the said complainant had a right so to use the current flow and falls of said Kennebec River for this and many other purposes, the said complainant's land being greatly enhanced in value by reason thereof,"

6th: "and this valuable right has been wholly destroyed by the acts of the Central Maine Power Company heretofore described, whereby said Kennebec River theretofore running over, along, and by said land of the said complainant has now become a still lake or pond with the usual characteristics thereof; whereby the aforesaid swift and powerful current no longer exists and said great element of value in the complainant's land has been taken from her,"

7th: "and appropriated by the said Central Maine Power Company and transferred from undeveloped horse power in the possession of the complainants to developed horse power in the possession of the said Central Maine Power Company, for the profit and benefit of the said Central Maine Power Company, its successors and assigns forever."

Instead of discussing seriatim the portions of the complaints excepted to, we may classify them and thus attain clarity and brevity in treatment.

The 1st, 5th, 6th and 7th allegations are pertinent if the owner of an unimproved upper mill site may recover damages for its flowing.

The 2nd and 3rd allegations are to the effect that the usufruct of complainants' two or several mill sites adds great value to their owners; and the 4th that defendant has paid a certain amount per horse power for "right to current" on other lands now submerged by its dam.

If it be held that the allegations of the first group above are not pertinent, the ruling of the Justice below will be sustained.

A mill privilege, as the term is used here, presupposes a mill site, understood when the first Mill Act was passed as a place on a stream where a dam might be seated to furnish power for grist, saw, carding and fulling mills, and it may be mills of other sorts, "serviceable for the public good, and benefit of the town, or considerable neighborhood, in or near to which they may have been erected." Mill seat, now mill site, and mill privilege have been household words of the people served by power dams on streams since the mud-sill of the first dam was seated in the territory now the state of Maine, for full three hundred years.

The terms are synonymous, used interchangeably to name a location on a stream where by means of a dam a head and fall may be created to operate water wheels.

The property right in a mill site has been recognized, and protected by legislation, as an incorporeal hereditament attached to the land of the riparian owner, and since 1841 a proprietor of an upper mill privilege, in this State, can not be deprived thereof if his privilege has been developed and not clearly abandoned, defeated or lost.

Is this incorporeal hereditament, when no dam or mill has been erected, a property right that may not be taken from the riparian owner by the filling and maintaining of a pond for operating a lower water mill, without compensation in damages?

Riparian owners have been deprived of certain rights in rivers and streams as American history has been written, as in New England where exclusive right to the taking of food fish has been

granted to towns, unquestioned to this day in certain Maine towns, or in mineral bearing states where the very water of the stream is appropriated by a first taker for the furtherance of mining, or where irrigation projects are of public benefit, and in all states where for a public use a water district includes a stream.

A riparian owner on a floatable stream has not a monopoly of the use of the stream or its banks. He must yield to the rights of others, at reasonable times to float timber down the stream, and allow necessary use of his banks by the owners of the timber and their servants, as travel up and down the banks is called for; he must allow the passage of boats.

In these and other ways the right of the owner in his mill privilege is limited. To erect a dam and mill thereon, when thereby no owner above or below is injured, is his right, but he must so operate his dam as to let the natural volume of the stream pass through, as well as the logs of the river driver.

Further, it was declared in Massachusetts, when our present state was a part of the former, that if a lower proprietor on a stream shall erect and maintain a dam for furnishing power to water wheels, and the pond created by such dam shall flow a mill site above, never improved, or improved and abandoned, the upper owner can not recover damages of the lower, although, so long as he maintains his dam he deprives the upper proprietor of any right to use his privilege to work a mill.

This follows as a result of the nature and extent of the right in the upper owner. His right is defeasible and if it is not asserted and availed of by him, he must submit to lower development, on a scale commensurate with the needs of the section benefited, and he may not have damages for the right of which he is deprived, a right which he shared with other riparian owners, and lost when such other made prior appropriation of his site. The lower "owners shall have free liberty to continue and improve such pond, for their best advantage, without molestation." Colonial Act of 1714. The lower owners may erect a water mill, and if, "in so doing any land shall be flowed not belonging to the owner of such mill, it shall be lawful for the owner or occupant of such mill to continue the same head of water to his best advantage, in the manner and on the terms hereinafter mentioned." Laws of Maine, 1821, Chap. 45.

These, however, only assure to the lower owner his common law right to flow so far as necessary for reasonable use. The rule that appropriation of an unimproved or abandoned mill site is *damnum absque injuria* originated in Massachusetts and is known as the Massachusetts Rule: "for the owner of a mill site, who first occupies it by erecting a dam and mill, will have a right to water sufficient to work his wheels, if his privilege will afford it, notwithstanding he may, by his occupation, render useless the privilege of any one above or below him upon the same stream." *Hatch* v. *Dwight*, 17 Mass., 288, 296.

It is important to note that this case was tried upon issues raised before the separation of Maine from Massachusetts.

"The usefulness of water for mill purposes depends as well on its fall as its volume. But the fall depends on the grade of the land over which it runs. The descent may be rapid, in which case there may be fall enough for mill sites at short distances; or the descent may be so gradual as only to admit of mills at considerable distances. In the latter case, the erection of a mill on one proprietor's land may raise and set the water back to such a distance as to prevent the proprietor above from having sufficient fall to erect a mill on his land.

It seems to follow as a necessary consequence from these principles, that in such case, the proprietor who first erects his dam for such a purpose has a right to maintain it, as against the proprietors above and below; and to this extent, prior occupancy gives a prior title to such use.

It is a profitable, beneficial, and reasonable use, and therefore one which he has a right to make. If it necessarily occupy so much of the fall as to prevent the proprietor above from placing a dam and mill on his land, it is *damnum absque injuria*. . . . Such appears to be the nature and extent of the prior and exclusive right, which one proprietor acquired by a prior reasonable appropriation of the use of the water in its fall; and it results, not from any original superior legal right, but from a legitimate exercise of his own common right, the effect of which is, *de facto*, to supersede and prevent a like use by other proprietors originally having the same common right." *Cary* v. *Daniels*, 8 Met., 466, 477.

"This priority of first possession necessarily arises from the

nature of appropriation; where two or more men have an equal right to appropriate, and where the actual appropriation by one necessarily excludes all others, the first in time is the first in right." *Gould* v. *Boston Duck Co.*, 13 Gray, 442, 451.

"To the extent to which the descent or fall of water in a stream is taken up and occupied by the erection of dams for the purpose of carrying mills, the right of other owners on the same stream, who have not improved their sites for the creation of water power and the driving of mills, is abridged and taken away. In such cases prior occupancy gives priority of title. Although the right to the use of water is inherent in and appurtenant to land, it is nevertheless in a certain sense a right *publici juris,* and subject to the rule of law, which regards the erection of a dam for the purpose of creating mill power a profitable, beneficial and reasonable use of the stream, of which riparian proprietors on the same stream, who have not appropriated the same force and fall of the water on their own land, can not complain.

"It is *damnum absque injuria.* . . . It is in view of the well established doctrine of the common law of this state, that the provisions of the mill act, so called, are to be construed and administered. By the first section of the R. S., Chap. 116, which is substantially a reenactment of S. 1795, Chap. 74, Sec. 1, full power is given to any person to erect and maintain a water mill and dam to raise water upon any stream not navigable, according to the terms and conditions, and subject to the regulations, therein expressed.

"The only limitation on this power, so far as the rights of other owners of mill sites or water powers on the same stream may be effected by its exercise, is found in the second section of the same chapter, and in S. 1841, Chap. 18, which provides that no such dam shall be erected to the injury of any existing mill or of any mill site which shall have been previously used or occupied.

"But no provision is made to protect unoccupied or unimproved mill sites. Nor are they included specifically as a subject of damages in the fourth section of the statutes, which provides for a compensation to parties 'whose land is overflowed or otherwise injured' by the erection and maintenance of a dam. The great purpose of these statutes, as declared in the preamble to S. 1795, Chap. 74, was to prevent the erection and support of mills from

being 'discouraged by many doubts and disputes.' They were not intended to confer any new right, or to create an additional claim for damages, which did not exist at common law.

"They only substituted, in the place of the common law remedies, a more simple, expeditious and comprehensive mode of ascertaining and assessing damages to persons whose lands were overflowed or otherwise injured by the erection and maintenance of dams on the same stream, for the purpose of creating a water power and carrying mills. It follows that, as a riparian proprietor could recover at common law no damages occasioned to an unimproved or unappropriated mill site by the erection of a dam and mill on the same stream below, he can not maintain a complaint under the mill act to recover similar damages." *Fuller* v. *Chicopee Mfg. Co.*, 16 Gray, 43.

And the Court says, in the same opinion; "This is the first case, so far as we know, in which an attempt has been made by a complaint under R. S., Chap. 116, or under the previous statutes enacted for the erection and regulation of mills, to claim damages for injury done to an unoccupied mill site. The fact that there is no precedent for such a claim is not conclusive, but it is strong evidence against the existence of any such right as the complainant sets up in the present case."

Residents in the province of Maine, before separation from the mother state are conclusively held to have adopted the common law, as expressed by the courts of that state and Massachusetts Bay Colony.

The declaration of the common law in *Hatch* v. *Dwight*, supra, is as effective, if not repealed, in Maine, as if it were a declaration of our court, because the plaintiff in that suit acquired an interest in the privilege under litigation in 1807; took possession in 1817; and the writ was brought before Maine became a separate state.

The case was tried at the May term, 1820, and all conditions affecting its decision were existent before the separation.

It happened that an action between owners of mills and dams on a river dividing the states of Massachusetts and Rhode Island, some of the proprietors being residents of either state, was tried in the circuit court six years later, *Tyler* v. *Wilkinson*, 4 Mason, 397.

Expressions of Story J., who delivered the opinion in that case have been used as authority contrary to the Massachusetts rule.

In that case the question at issue was the quantity of water which the proprietors of an upper mill privilege, improved by a dam, were allowed to discharge by means of a penstock from their dam to a trench which diverted the water from the natural channel of the river and returned it thereto at a point below the dam of proprietors of a lower privilege, also improved.

In the opinion, the learned jurist gives expression to some of the many principles of law then limiting the rights of riparian owners whose lands extend to the thread of the same stream.

Several of his observations were but dicta, and in the hundred years that have followed the decision in *Hatch* v. *Dwight*, supra, the Massachusetts court has not abandoned that decision.

Owners of riparian lands on any river, from its source to its mouth have rights in common. They may make reasonable use of its current over rips and falls not appropriated by the local owner, and over or through the obstructions caused by reasonable appropriation by the local owner.

So far as the reasoning has application to the cases at bar, *Tyler* v. *Wilkinson* is not in opposition to the Massachusetts rule. It is held there that as to the right of one of several riparian owners to the flow of a stream, "common by nature, there may be an appropriation by general consent or grant. Mere priority of appropriation of running water, without such consent or grant, confers no exclusive right. It is not like the case of mere occupancy, where the first occupant takes by force of his priority of occupancy. That supposes no ownership already existing, and no right to the use already acquired. But our law annexes to the riparian proprietors the right to the use in common, as an incident to the land; and whoever seeks to found an exclusive use, must establish a rightful appropriation in some manner known and admitted by the law." *Tyler* v. *Wilkinson*, supra, at 401.

The action above was not brought under the Mill Act. It was not for damages for flowing lands of an upper proprietor.

In cases of the latter class, the Mill Act makes the appropriation by construction on the lower site, before any development is

begun on the upper site, a rightful appropriation, "known and admitted by the law." There is no reason to suppose that Judge Story conceived that his findings on the facts before him, the right by grant or long established user to divert water from a lower proprietor, would be asserted as restricting the right given by the common law to flow the lands of an upper proprietor.

In Maine, litigation over rights in water powers began soon after the establishment of the state, and the principle was announced by our court in 1832 that the right of the owner of an undeveloped mill site is not complete. As against the owner of a lower site, the right to develop and use the upper is suspended, if the lower is first developed and flows the upper site, suspended so long as by the use of the lower site the other is submerged.

"A mill privilege, not yet occupied is valuable for the purposes to which it may be applied. It is property, which no one can have a legal right to impair or destroy, by diverting from it the natural flow of the stream, although it may be impaired by the exercise of certain lawful rights, originating in prior occupancy." *Blanchard* v. *Baker*, 8 Me., 253, 268.

It can not be said that in preparation of the opinion above quoted the Court lost sight of the principle herein announced, for in the opinion reference is made to the fact that in jurisdictions other than Massachusetts and Maine another rule is announced.

Again in 1835 the same view is expressed. *Butman* v. *Hussey*, 12 Me., 407.

After the Maine mill act was amended so as to prohibit the erection of a dam, to the injury of any mill lawfully existing above or below it on the same stream, cases arose and the law was applied, though none are reported where damages are demanded for flowing an unimproved site.

In 1868 in a case for damages for flowing an improved upper mill site, these words were used: "The plaintiff's dam was originally erected before the defendant's. This is not controverted. In cases of this description *qui prior est in tempore potior est in jure*," and the authority given is *Cary* v. *Daniels* and *Gould* v. *Boston Duck Company*, cases hereinbefore cited. *Lincoln* v. *Chadbourne*, 56 Me., 197.

From the date of that decision the principle has stood, unat-

tacked, and in reports and students' texts Maine is considered as having adopted the Massachusetts rule.

"A mill owner can at any time appropriate for raising and maintaining a head of water for working his mill so much space in the river valley as has not already been appropriated by some other mill owner for his own mill." *Fibre Co.* v. *Electric Co.*, 95 Me., 318, 49 A., 1095.

As against all the world except riparian proprietors, one who owns a mill site may seek damages if deprived of his right.

But because of the right common to riparian proprietors, *publici juris*, to further the public good the doctrine of appropriation of a mill privilege grew up as naturally as the doctrine of appropriation of the water of a stream for mining grew and established itself over this country from the mountains of the west to the plains. It was founded on necessity, based on the conditions of the watershed of Massachusetts and Maine, at a time when a twelve feet head of water was a monstrous power, and what would now be tiny mills were necessities of domestic and industrial life.

In the present era of industrial development, in the few states that have not coal, but have streams in volume and character like ours, there is ever more insistent demand for the development of water power sites ; not in separate independent units, however, but in aggregate of head, as the topographical features of the watershed dictate. So that what may have never suggested profitable development as a power site, until a great enterprise was begun, now demands the changing of the river from a stream of strong, swift current to a pond, with the consequence that a recognizable but unprofitable mill site may be flowed by a lower riparian owner, without damages for the appropriation or change.

It is conceivable that on any half mile of the river along Carratunk a dam might be erected, though at such expense as to be an unprofitable venture, if its pond were filled, but none of any economic value if all were built upon.

Construction at the strategic point flows out many possible sites, and the law as understood in this state favors the erection of the great dam, for the good of the greater number.

Flowing the lands of another for the purpose of working mills, is a right recognized in this jurisdiction, not as an exercise of the

eminent domain, for our mills are not of public use, as the term is understood in law, and our constitution does not authorize taking for the benefit of the public as does that of Massachusetts. *Brown v. Gerald,* 100 Me., 351, 370, 61 A., 785; *Murdock* v. *Stickney,* 8 Cush., 113; *Bates* v. *Weymouth Iron Co.,* 8 Cush., 548, 553; *Lowell* v. *Boston,* 11 Mass., 454, 464; *Turner* v. *Nye,* 154 Mass., 579, 14 L. R. A., 487, 28 N. E., 1048.

Flowing of riparian lands is an adjustment and regulation to assure development of reasonable use of such lands among riparian owners. See cases cited in *Brown* v. *De Normandie,* 123 Me., at 541, 124 A., 697.

In that adjustment we do not recognize, in theory or in fact, that the owner of land flowed by a pond for a water mill is a part owner in the developed lower privilege. He still owns his flowed land, and may still use it on which to sink a pier or in which to drive piling, *Jordan* v. *Woodward,* 40 Me., 317, 324, or submit it to any reasonable use not detrimental to the maintenance of the pond.

But he does not participate in the ownership of the dam and mill below. He is not entitled to share in the profits of the lower development simply from the fact that his unimproved mill site, or the rocky course of the bed of the river on his land, does its part in upholding the impounded water.

Items of alleged damage for changing the current to still pond water are not to be included in the evidence for consideration by the commissioners; their statement is not pertinent to process under the Mill Act.

The allegations of the first group were properly expunged, and the others fall with this group. *Exceptions overruled.*

## DISSENTING OPINION

PATTANGALL, C. J. I regret being compelled to disagree with the conclusions reached by the majority of the Court and stated so admirably by Mr. Justice Barnes speaking for them, but the questions involved seem too important to permit a mere noting of non-concurrence unaccompanied by a full statement of the reasons therefor.

The immediate issue is as to the admissibility of certain evidence affecting the value of complainants' land located within the flowage area of defendant's dam. Complainants contend that this value is enhanced by the fact that certain riparian rights attach to the flowed premises, that these are property rights, that they are destroyed by the flowage, and that reasonable compensation should be made therefor. Defendant's position, made clear in the majority opinion and approved by it, is that, even though complainants are able to substantiate the facts upon which their claim is based, no actionable damage is proven; hence, the evidence offered is immaterial and irrelevant.

Defendant's dam was erected by authority of what is commonly known as the Mill Act, and damages are claimed as provided therein. The important statutory provisions involved are Sections 1, 2, 4, 5, 9, and 25 of Chap. 106, R. S., 1930.

"Sec. 1. Any man may on his own land, erect and maintain a water-mill and dams to raise water for working it, upon and across any stream, not navigable; or, for the purpose of propelling mills or machinery, may cut a canal and erect walls and embankments upon his own land, not exceeding one mile in length, and thereby divert from its natural channel the water of any stream not navigable, upon the terms and conditions, and subject to the regulations hereinafter expressed.

"Sec. 2. No such dam shall be erected or canal constructed to the injury of any mill or canal lawfully existing on the same stream; nor to the injury of any mill site, on which a mill or mill-dam has been lawfully erected and used, unless the right to maintain a mill thereon has been lost or destroyed.

"Sec. 4. Any person whose lands are damaged by being flowed by a mill-dam, or by the diversion of the water by such canal, may obtain compensation for the injury, by complaint to the superior court in the county where any part of the lands are; but no compensation shall be awarded for damages sustained more than three years before the institution of the complaint.

"Sec. 5. The complaint shall contain such a description of the land flowed or injured, and such a statement of the dam-

age, that the record of the case shall show the matter heard and determined in the suit.

"Sec. 9. . . . the court shall appoint three or more disinterested commissioners of the same county, who shall go upon and examine the premises, and make a true and faithful appraisement, under oath, of the yearly damages, if any, done to the complainant by the flowing of his lands or the diversion of the water described in the complaint, and determine how far the same is necessary, and ascertain and report for what portion of the year such lands ought not to be flowed, or water diverted, or what quantity of water shall be diverted. They shall also ascertain, determine, and report what sum in gross would be a reasonable compensation for all the damages, if any, occasioned by the use of such dam.

"Sec. 25. No action shall be sustained at common law for the recovery of damages occasioned by the overflowing of lands, or for the diversion of the water as before mentioned, except in the cases provided in this chapter, to enforce the payment of damages after they have been ascertained by process of complaint as aforesaid."

The direct issue is of first impression in this Court, although many of our decisions bear forcibly upon it. It has been passed upon in other jurisdictions and, so far as my research goes, no court with the exception of that of Massachusetts has accepted the view advanced by the defendant. While the findings of that court are entitled to and are certain to receive from this Court high consideration, we have, at times in the past, and doubtless will in the future find ourselves in disagreement with the conclusions reached by it. So far as the instant case is concerned, I shall endeavor to point out a variance in the organic law of this state and Massachusetts which in a measure might warrant a difference of opinion on the issue before us.

There are certain fundamental principles underlying the complainants' contention which must be kept in mind in order to reach an intelligent conclusion. They assert that riparian rights are included in the word "land" as used in our statutes; that such rights are property rights; that they not only add to the value of the

land but constitute a part of it; and that, being property, the owners thereof can not be deprived of them without compensation, even by legislative act.

So far as the first of these suggestions is concerned they rely upon the definition of "land" in the Rules of Construction, Paragraph X, Sec. 6, Chap. 1, R. S., 1930. "The word 'land' or 'lands' and the words 'real estate' include lands and all tenements and hereditaments connected therewith and all rights thereto and interests therein." In *Brown* v. *DeNormandie*, 123 Me., 535, our Court, at page 546, 124 A., 697, adopted this definition in its discussion of the right to flow certain property under the Mill Act, and it has been many times referred to and applied literally in tax cases, *Stevens, Collector* v. *Dixfield and Mexico Bridge Company*, 115 Me., 402, 99 A., 94; *Foxcroft* v. *Straw*, 86 Me., 76, 29 A., 950; *Paris* v. *Norway Water Co.*, 85 Me., 330, 27 A., 143; *Kittery* v. *Portsmouth Bridge*, 78 Me., 93, 2 A., 847; *Hall* v. *Benton*, 69 Me., 346; in condemnation proceedings under the right of eminent domain, *Lime Rock R. R.* v. *Farnsworth*, 86 Me., 127, 29 A., 957; in cases involving easements, *Currie* v. *Railroad*, 105 Me., 529, 75 A., 51; and in various other cases.

All of the authorities agree that riparian rights are to be regarded and protected as property.

"The riparian proprietor may insist that the right to the use of water flowing in a natural stream shall be regarded and protected as property. Such a right is not a mere easement or appurtenance but is inseparably annexed to the soil itself." *Hamor* v. *Bar Harbor Water Co.*, 78 Me., 134, 3 A., 40, 43.

"The plaintiff, as a lower mill owner, had the right to the natural flow of the river, which right is regarded and protected as property, and, before the defendant had a right to take and detain the waters of the river, it was incumbent upon him to take the water in the same manner as it would be required to take other property." *Hubbard* v. *Limerick Water and Electric Co.*, 109 Me., 248, at 250, 83 A., 793, 794.

"All these rights which the riparian owner has in the running stream are as certain, as absolute, and as inviolable as any other species of property and constitute a part of the land as much as the trees that grow thereon or the mill or the house that he builds

thereon. He can be deprived of them only through the power of eminent domain constitutionally exercised." Opinion of the Justices, 118 Me., 507, 106 A., 865, 869.

"The right to have a natural watercourse continue its physical existence upon one's property is as much property as is the right to have the hills or forests remain in place. There is no property right in any particular particle of water or in all of them put together. The advantages resulting from a stream of water uniting in one mass maintain a perpetual course through the land and these particles are therefore regarded as part of the common mass and subject to no man's ownership.

"The extent of the property right is well expressed in *Warder* v. *Springfield*, 9 Ohio, 855, where it is said that no riparian owner has absolute property in the waters of a stream, but each has the use of the flow past his lands for domestic, manufacturing and other lawful purpose. The property therefore consists not in the water itself but in the added value which the stream gives to the land through which it flows. This is made up of the power which may be obtained from the flow of the stream, from the increased fertility of the adjoining fields because of the presence of the water, and of the value of the water for the uses to which it may be put. The right to the continued existence of these conditions is property. *McCoy* v. *Donley*, 57 Am. Rep., 680; *Union Mill and Min. Co.* v. *Ferris*, Federal Cases No. 14371; *Schaefer* v. *Marthaler*, 57 Am. Rep., 73.

"To protect this right, the owner may resort to any or all of the instrumentalities which may be employed for the protection of private property rights. *Crawford Co.* v. *Hathaway*, 60 L. R. A., 889; *McCord* v. *High*, 24 Iowa, 336. And the owner can not be deprived of it without compensation and due process of law. The legislature may not under the guise of protecting the public interest arbitrarily interfere with private rights therein. The advantage of a flowing stream may be considered in fixing compensation for the abutting property when taken under the power of eminent domain.

"The right to the flow of the stream is a property right, and the owner of it has the right to say whether he wishes to maintain its value as such, and in case others attempt to deprive him of it, they

should pay for the injury which would thereby be caused to him. While the water right is incorporeal, it is not personal property but is a parcel of the estate itself.

"The right does not depend upon appropriation but exists as part of the land. It is similar to that of having a highway remain adjacent to property on which it abuts. The first and most important right which the riparian owner has in the stream is to the continued flow of the water in its natural condition. This right is fundamental and one of which the riparian owner can not be deprived; but it is not absolute. Each riparian owner has a right to make such use of the water as he can without materially diminishing the equal rights of the others. It is immaterial whether the owner is making any use of the water or not. A large part of the value of a stream consists in its motion. The lower owner has no right therefore to dam the water back on the upper property." 2 *Farnham Water and Water Rights*, 1565 to 1575.

In *Clark* v. *Cambridge Irrigation Co.*, 45 Neb., 798, 64 N. W., 239, it is held that, except as abrogated or modified by statute, the common law doctrine with respect to the rights of private riparian proprietors prevails in this country, and that such right is property which, when vested, can be impaired or destroyed only in the interests of the general public upon full compensation and in accordance with established law.

"This doctrine with respect to the rights of private riparian proprietors, except as modified by statute, prevails in this country. *Eidemiller Ice Co.* v. *Guthrie*, 42 Neb., 238, 60 N. W., 717, 28 L. R. A., 581; Black's Pomeroy, Waters, secs. 127, 130, and authorities cited. At the common law every proprietor, as an incident to his estate, is entitled to the natural flow of the water of running streams, undiminished in quantity and unimpaired in quality, although all have the right to the reasonable use thereof for the ordinary purposes of life (3 Kent, Commentaries, 439; Angell, Water Courses, sec. 95; Gould, Waters, sec. 204; Black's Pomeroy, Waters, sec. 8), and any unlawful diversion thereof is an actionable wrong.

"The rights of a riparian proprietor, as such, are property, and, when vested, can be destroyed or impaired only in the interest of the general public, upon full compensation, and in accordance

with established law." *Lux* v. *Haggin*, 69 Cal., 255, 10 Pac., 674; *Yates* v. *City of Milwaukee*, 10 Wall., 497, 19 L. Ed., 984; *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S., 672, 4 Sup. Ct., 15, 27 L. Ed., 1070; *Delaplaine* v. *Northwestern R. Co.*, 42 Wis., 214, 24 Am. Rep., 386; *Bell* v. *Gough*, 23 N. J. Law, 624.

"The riparian proprietor, say all the books and the authorities, has a right to the flow of the water of the natural stream passing through or by his land; such right being inseparably annexed to the soil, and passing with it, not as an easement or appurtenance, but as a part and parcel of the land. This property right can be regarded only as a corporeal hereditament belonging to and incident to the soil, the same as though it were stones thereon, or grass, or trees springing from the earth. Gould on Waters, section 204, and authorities there cited. The riparian right to the use of the water flowing in a natural water course is a property right, which should be regarded as such, and to protect which the owner may resort to any or all instrumentalities which may be employed for the protection of private property rights generally. . . ." *Crawford Co.* v. *Hathaway* (*Neb.*), 93 N. W., 781, at 784 and 786.

"As respects the rights of the land owner to streams, it is to be observed that, while he has a property in the *stream*, he has no property in the *water* itself, aside from that which is necessary for the gratification of his natural or ordinary wants. . . . The right of enjoying this flow without disturbance, interference or material diminution by any other proprietor, is a natural right, and is an incident of property in the land, like the right the proprietor has to enjoy the soil itself, without molestation from his neighbors. The right of property is in the right to use the flow, and not in the specific water. . . . The right to use the water of such streams for milling purposes, is as necessary as the right of transportation. Indeed, it is this consideration that oftentimes imparts the chief value to the estate of the riparian proprietors, and without which it would have no value whatever in many instances." *Lancey* v. *Clifford*, 54 Me., 490.

There are no differences of opinion among the authorities on the point that in fixing the value of land for taxation, riparian rights are to be considered.

"Could it be successfully contended that the land was to be assessed only for its value as land for farming, or for any other use to which it might be put disconnected from the stream? Is land upon which there is a valuable unimproved water privilege, where no power is being developed, to be assessed only for the value of the land without privilege? May it not be the chief value of the land that it had a privilege upon it? . . . We think that in so far as this land was made more valuable by the stream and fall, so far these were property to be considered in the valuation of the land." *Water Power Co.* v. *Buxton*, 98 Me., 295, at 297 and 298, 56 A., 914, 915.

"Land upon which a mill privilege exists is taxable and the value of the land may be greatly enhanced by the fact that its topography is such that a dam may be maintained across a stream upon it and water power thereby created. The capability of the land for such use and the probability or certainty, as the case may be, of its use certainly affects its value." *Fibre Co.* v. *Bradley*, 99 Me., 263, 59 A., 83, 87.

In *Shawmut Mfg. Co.* v. *Benton*, 123 Me., 121, 122 A., 49, the rule of the Buxton case and the Bradley case was affirmed, and in *Power Company* v. *Turner*, 128 Me., 486, 148 A., 799, it was reaffirmed and elaborated in the following language:

"Land upon which a mill privilege exists is taxable at its worth as land enhanced by the value of its capacity for water power development, or to use the language of *Fibre Co.* v. *Bradley*, by the value of 'the capability of the land for such use.' If the privilege is undeveloped or, developed, is not utilized, the capacity of the land for power development, often termed its 'potential development,' is nevertheless an element of value to be considered in its tax valuation. As was said in *Water Co.* v. *Buxton*, the chief value of a parcel of land may be that it has a privilege upon it, and, in so far as the land is made more valuable by the stream and fall within its limits, so far these elements are to be *considered in its valuation.*"

"The value of land depends upon its capacity for improvement. The elements of its value may be its fertility, the minerals in its soil, its location, the configuration of its surface, and many other circumstances one or more of which may be incident to a certain tract of land. In estimating its value for the *purposes of sale* or of

taxation, all of these incidents should be considered and the element or elements of value which lead to the most profitable form of improvement fixes the proper valuation of the land." *Slatersville Finishing Co.* v. *Green et al,* 40 R. I., 410, 101 A., 226, 228.

In *Blackstone Manufacturing Co.* v. *Blackstone,* 200 Mass., 82, 85 N. E., 880, the doctrine set out in *Saco Water Power Company* v. *Buxton,* supra, and *Penobscot Chemical Fibre Company* v. *Bradley,* supra, was accepted and the Court agreed with Judge Emery's dissenting opinion in *Water Power Co.* v. *Auburn,* 90 Me., 67, 37 A., 331, in which it is said, "So far as the land is more valuable by reason of the stream and fall upon it, so far are these to be considered in the valuation of the land and no farther. This consequent increase of value is a question in commercial economics and requires for its determination the consideration of possible revenues to be drawn from the land and the possible price to be obtained for it."

"Water power has been held to be 'a capacity of land for a certain mode of improvement which can not be taxed independently of the land.' Land upon the bank of a river and in its bed where there is a fall and adjacent land adapted for flowage may have a largely increased worth in the market by reason of these characteristics which may be made available for valuable use in different ways. The valuable uses to which the land of the Essex Company could be put, including that of developing the capacity of the river for power, should be considered in estimating its fair cash value." *Essex Co.* v. *Lawrence,* 214 Mass., 79, 100 N. E., 1016, 1018.

The rule that in valuing land taken under condemnation proceedings, riparian rights must be considered as a factor is undisputed.

"One whose land is taken by eminent domain is entitled to be compensated in money for the fair value in the market of that of which he has been deprived. In ascertaining what that value is, all the uses to which the property is reasonably adapted may be considered." *Smith* v. *Commonwealth,* 210 Mass., 261, 96 N. E., 666, 667.

"In order to prove damages occasioned to the land of the petitioner which was not taken, but which formed part of the same parcel, it was competent for him to show the uses to which it might

profitably be applied, before and after the taking. That is one way of showing the diminution in value caused by the taking. It was evidence of the actual capacity of the land for future improvement as a fact affecting its value. When any part of the land is taken, the loss of natural advantages, which give value to the whole parcel, is to be taken into account, although the owner had no exclusive or unconditional right to the same." *Drury* v. *Midland Railroad,* 127 Mass., 571, at 582, 583; *Hanford et al* v. *St. Paul & D. R. Co.* (Minn.), 42 N. W., 596.

We are forced, therefore, to these conclusions: that riparian rights are included in the word "land" as used in our statutes; that they are property; that they are part and parcel of the upland with which they are inseparably connected; that the value of the upland is enhanced by their existence and must be so considered in matters of taxation, condemnation or sale. By what line of reasoning can it be said that they are not to be regarded in arriving at damages sustained by reason of flowage caused by the erection of a dam under the Mill Act?

The Mill Acts originated in Colonial days, the first of which we have record being adopted in Massachusetts in 1714, Chap. 15, 1 Province Laws, 729. They were born of the necessities of a pioneer people to whom water-driven grist mills, saw mills and fulling mills rendered as truly a public service as do the railroad, the telephone and telegraph, the lighting company and the water company of today. Preceding in their enactment written constitutions, either State or Federal, it has been found difficult to reconcile their provisions with certain principles of law which we have learned to regard as the foundation upon which private property rights depend. Their constitutionality has often been attacked on the ground that they authorize the taking of property for other than public use, and in certain jurisdictions this view has prevailed. *Ryerson* v. *Brown,* 35 Mich., 333; *Sadler* v. *Langham,* 34 Ala., 31; *Loughbridge* v. *Harris,* 42 Ga., 500; *Hay* v. *Cohoes Co.,* 2 N. Y., 159; *Tyler* v. *Beecher,* 44 Vt., 648. On the other hand, the courts of Massachusetts, Maine, Connecticut, New Hampshire, Tennessee, Indiana, Kansas and Wisconsin have sustained their validity, and the United States Supreme Court has passed favorably upon them. *Head* v. *Amoskeag Mfg. Co.,* 113 U. S., 9; *Kaukauna Water Co.*

v. *Canal Co.*, 142 U. S., 254; *Otis Co.* v. *Ludlow Mfg. Co.*, 201 U. S., 140. The Act is in full force today in this state. *Brown* v. *DeNormandie*, supra.

In the earlier cases in Massachusetts the Act was sustained under the eminent domain clause of the Bill of Rights and it would seem that the doctrine has been accepted in most of the states where it is now in vogue on the authority of these decisions. *Brown* v. *Gerald*, 100 Me., 351, 61 A., 785. Later on, this theory was abandoned by the Massachusetts court and in *Lowell* v. *Boston*, 111 Mass., 454, at page 467, the court found constitutional justification for the Act in Article IV, Sec. 1, Chapter 1, of the State Constitution, which provides, "And further, full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, and ordinances, directions and instructions, either with penalties or without; so as the same be not repugnant or contrary to this constitution, as they shall judge to be for the good and welfare of this Commonwealth, and for the government and ordering thereof, and of the subjects of the same."

The Constitution of New Hampshire, Article 5, provides, "Full power and authority are hereby given to the General Court from time to time to make, ordain and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions and instructions, so that the same be not repugnant or contrary to this Constitution, that they may judge for the benefit and welfare of the State." It is on the authority of this clause that the Court in *Mfg. Co.* v. *Fernald et al*, 47 N. H., 444, held the Mill Act constitutional.

There is no provision in the Constitution of Maine similar to that in the Constitutions of Massachusetts and New Hampshire, hence this Court continued to find a basis for the Mill Act in the right of eminent domain, although as early as 1855 doubt began to be expressed as to the theory that private property could properly be taken for use by those desiring to erect and maintain dams for private profit. In *Jordan* v. *Woodward*, 40 Me., 317, the Court, after quoting Sec. 21 of Article I of our Constitution which reads "Private property shall not be taken for public uses, without just

compensation, nor unless the public exigencies require," said, "The Mill Act, as it has existed in this State, pushes the power of eminent domain to the very verge of constitutional inhibition. If it were a new question, it might well be doubted whether it would not be deemed to be in conflict with the provision of the constitution cited above"; but added that "From its great antiquity, and the long acquiescence of our citizens in its provisions, it must be deemed the settled law of the state."

In 1904, however, our Court again asserted that "The principle on which these laws is founded is the right of eminent domain, the sovereign right of taking private property for public use. Their validity implies the power of the legislature to authorize a private right, which stands in the way of an enterprise to improve the water power, to be taken without the owner's consent, if suitable provision is made for his just compensation. The construction which the courts have generally given to the words 'property taken' and in the constitution is that they include permanent damage to property . . . and that an injury to the property of an individual is equivalent to taking it, if it deprives him of its ordinary use, and entitles him to compensation." *Ingram* v. *Water Co.*, 98 Me., 566, at 572, 57 A., 893, 894.

In *Brown* v. *DeNormandie*, supra, this Court agreed that it was too late to challenge the constitutionality of the Mill Act, regardless of whether its validity rested upon great antiquity, eminent domain, or the Massachusetts and New Hampshire doctrine of public welfare. It was not noted in this opinion that Maine's Constitution contained no general welfare clause.

On the whole it appears that in this state the early assumption that the Act conferred the right of eminent domain has never been rejected, even though questioned and apparently inconsistent with the reasoning of *Brown* v. *Gerald*, supra; and it may be noticed in passing that *Smith* v. *Power Co.*, 125 Me., 238, 132 A., 740, somewhat narrows the conclusions and implications of the opinion in the last named case.

"Upon principle and authority, therefore, independently of any weight due to the opinions of the courts of New Hampshire and other States, maintaining the validity of general mill acts as taking private property for public use, in the strict constitutional

meaning of that phrase, the statute under which the Amoskeag Manufacturing Company has flowed the land in question is clearly valid as a just and reasonable exercise of the power of the legislature, having regard to the public good, in a more general sense, as well as to the rights of the riparian proprietors, to regulate the use of the water power of running streams, which without some such regulation could not be beneficially used. The statute does not authorize new mills to be erected to the detriment of existing mills and mill privileges. And by providing for an assessment of *full compensation* to the owners of lands flowed, it avoids the difficulty which arose in the case of *Pumpelly* v. *Green Bay Co.*, 13 Wall., 16.

"Being a constitutional exercise of legislative power, and providing a suitable remedy, by trial in the regular course of justice, to *recover compensation for the injury to the land of the plaintiff in error*, it has not deprived him of his property without due process of law, in violation of the Fourteenth Amendment of the Constitution of the United States." *Head* v. *Amoskeag Manufacturing Co.*, 113 U. S., 9, at 26.

"General objections to Mill Acts as taking property for private use or on other grounds have been disposed of by former decisions of this Court. Such acts have been in force in Massachusetts ever since an Act of 1714, Chapter 15, 1 Province Laws, 729. The practice sanctioned by them would seem from their recitals to have been still older." *Otis Co.* v. *Ludlow Manf. Co.*, supra, at 151.

"A state legislature may authorize the taking of land upon or riparian rights in a navigable stream for the purpose of improving its navigation, and if a surplus of water is created, incident to the improvement, it may be leased to private parties under authority of the State, or retained within control of the State; but so far as land is taken for the purpose of the improvement, either for the dam itself or the embankments, or for the overflow, or so far as water is diverted from its natural course, *or from the uses to which the riparian owner would otherwise be entitled to devote it, such owner is entitled to compensation.*" *Kaukauna Water Power Co.* v. *Canal Co.*, supra.

In *Pumpelly* v. *Green Bay Company*, supra, the Court held that flowing land was equivalent to taking and that unless compensated for was a violation of property rights.

While it has taxed to some extent the ingenuity of jurists, especially in the more recent cases, to sustain the validity of Mill Acts in the face of constitutional prohibitions against taking private property for any but a public use, no Court aside from that of Massachusetts has asserted the right to do so without full compensation for the property taken.

It has been demonstrated that riparian rights are property rights, that flowing land is equivalent to a taking, and that "soil" or "upland" are not synonyms of "land," the latter being a far more comprehensive word. In only one jurisdiction has it been held that the proprietor of a mill dam may destroy the riparian rights of an upper or lower neighbor without making recompense therefor, and I venture to say that had that doctrine been regarded as a necessary corollary to the Mill Act, it would have been unquestionably held invalid by every other Court in the land in spite of its great antiquity.

It is of interest to trace the origin of the Massachusetts theory and the reasons given in support of it. It apparently arose in the first instance from the acceptance by the courts of that state of the doctrine of prior appropriation as stated in the earlier English and a few American cases.

This doctrine was first advanced by Blackstone in his Commentaries and was generally approved by the English courts as late as 1831. "By the law of England the person who first appropriates any part of the water flowing through his own land to his own use has the right to the use of so much as he appropriates, against any other." *Liggins* v. *Inge,* 7 Bing., 682, 693. "It all depends upon the priority of occupancy." *Bealey* v. *Shaw,* 2 Smith, 321, 330.

But in 1827 in *Tyler* v. *Wilkinson,* 4 Mason, 397, Fed. Cas. No. 14, 312, in an opinion by Judge Story, the doctrine was repudiated and the law declared to be that, "the natural streams, existing by the bounty of Providence for the benefit of the land through which it flows, is an incident annexed by operation of law to the land itself," and "there may be and must be allowed to all that which is a common, reasonable use. It is not like the case of mere occupancy, where the first occupant takes by force of his prior occupancy."

Chancellor Kent in the third volume of his Commentaries, published in 1828, cites *Tyler* v. *Wilkinson* with approval.

In 1833 in *Mason* v. *Hill*, 110 Eng. Reprint, 692, the English court, notwithstanding the fiat of Blackstone and the cases based upon it, held to the rule laid down by Judge Story. For a time thereafter the law in England appeared unsettled, but in *Wood* v. *Wand*, 154 Eng. Reprint, 1047, the court confirmed *Mason* v. *Hill*, supra, and in *Aubrey* v. *Owen*, 155 Eng. Reprint, 579, the law regarding riparian rights as stated in *Tyler* v. *Wilkinson*, supra, was positively affirmed and accepted unconditionally. That such is the true doctrine of the common law has not been questioned in England since that time, and has been generally accepted in America.

"Prior occupancy, short of the statute term of prescription and without consent or grant, will not confer any exclusive right as between different riparian proprietors to the use of a running stream." 3 Kent's Comm. (12th Ed.), Sec. 447.

The Note at 30 L. R. A., 665, states that "there was a strong tendency on the part of the judges in earlier times to recognize a right to obtain title to water by prior appropriation or occupancy and at one time it seemed that the doctrine would be established, but the later cases with possibly one exception have all been the other way, so that now no such right is recognized" and cites a long list of cases in support of the editorial statement, including *Heath* v. *Williams*, 25 Me., 209, and *Bearse* v. *Perry*, 117 Mass., 211, in which it was held that in the absence of the statute no right will be acquired by the erection of a dam.

A study of the Massachusetts cases indicates that had it not been for a divergence from the generally accepted view of the common law as related to the rights of riparian owners, the courts of that state would not have adopted and maintained a view regarding compensation for their loss contrary to that held in other jurisdictions.

In *Fuller* v. *Chicopee Mfg. Co.*, 16 Gray, 42 (1860), the Court said, "They (the Mill Acts) were not intended to confer any new right, or to create an additional claim for damages, which did not exist at common law. They only substituted, in the place of the common law remedies, a more simple, expeditious and compre-

hensive mode of ascertaining and assessing damages to persons whose lands were overflowed or otherwise injured by the erection and maintenance of dams on the same stream, for the purpose of creating a water power and carrying mills. It follows that, as a riparian proprietor could recover at common law no damages occasioned to an unimproved or unappropriated mill site by the erection of a dam and mill on the same stream below, he cannot maintain a complaint under the mill acts to recover similar damages."

This view of the common law, as has been stated, is contrary to that held in any other jurisdiction since the publication of *Tyler* v. *Wilkinson,* supra.

In *Pugh* v. *Wheeler,* 19 N. C., 50, a case quoted as authority by all of the text writers and affirmed in principle by a long line of decisions in the state of its origin, it is stated that, "We conceive, therefore, that it is the clear doctrine of the common law that all owners of land through which a stream runs may apply it to the purposes of profit. The only question then is, what are the rights of the owners above and below on a stream as against each other? Defendants say that such one of the owners as may first apply the water to any particular purpose gains thereby immediately the exclusive right to that use of the water. That is true, in this sense, that any other proprietor, above or below, can not do any act whereby that particular enjoyment would be impaired, without answering for the damages occasioned by the loss of the particular enjoyment. Whereas before the particular application of the water to that purpose, the damages would have been confined to the uses then subsisting. The truth is that every owner of land on a stream necessarily at all times is using water running through it, if in no other manner, in the fertility it imparts to his land and the increase in the value of it. There is, therefore, no prior or posterior in the use, for the land of each enjoyed it alike from the origin of the stream, and the priority of a particular new application or artificial use of the water does not therefore create the right to that use, but the existence or non-existence of that application at a particular time measures the damages incurred by the wrongful act of another in derogation of the general right to the use of the water as it passes through or from the land of the party complaining."

After quoting *Mason* v. *Hill*, supra, as authority for the above, it is added that, "No person can, for the sake of giving himself a use of the water, justify throwing it back upon the land of another so as to deprive him of any use of his land. . . . The policy of the Act makes it applicable to every case of an injury by the erection of a mill. . . . Consequently, a verdict which finds the actual damages is consistent with the objects of the statute. A person owning land on a stream and thereby entitled to certain beneficial uses of the water, if deprived by means of the acts of another of some of those uses which but for those acts he would enjoy, has sustained injury and is entitled to recover damages."

The courts of New Hampshire have taken what we conceive to be a sound view of the question at issue in this case. "An undeveloped water power is a property right inherent in the ownership of the adjacent riparian land, for the value of which, if any, the owner is entitled to compensation when it is taken under the Flowage Act. *Swain* v. *Pemigewasset Power Co.*, 76 N. H., 498, 502, 85 A., 288. The plaintiff's damage for its taking is measured by the difference between the value of her land after the defendant had flowed it and what it would have been worth on the date of its taking (*Hadlock* v. *Jaffrey*, 75 N. H., 472, 473, 76 A., 123) if the defendant's dam had not been built (*Wright* v. *Pemigewasset Co.*, 75 N. H., 3, 6, 70 A., 290; *Philbrook* v. *Berlin-Shelburne Co.*, 75 N. H., 599, 74 A., 873); that is, the difference between the value of the land free from, and subject to, the rights taken (*Lancaster* v. *Jefferson Electric Light Co.* v. *Jones*, 75 N. H., 172, 182, 71 A., 871; *Swain* v. *Pemigewasset Power Co.*, supra). In the ascertainment of the value of the property invaded, the owner is entitled to have it appraised for the most profitable purpose, or advantageous use, to which it could be put on the day it was taken. *Barker* v. *Publishers' Paper Co.*, 78 N. H., 571, 575, 103 A., 757, L. R. A., 1918 E 709; *Philbrook* v. *Berlin-Shelburne Co.*, supra." *Emmons* v. *Utilities Power Co.* (N. H.), 141 A., 65.

As already noted, the question has not been directly passed upon in Maine, but *Hamor* v. *Bar Harbor Water Company*, supra, quotes with approval from Ex parte Jennings, 6 Cow., 526, the following significant paragraph: "There is no reason why the same requirements should not apply equally to the taking of water from

a stream in which the plaintiffs have valuable riparian rights, as to the taking of land. Both are equally the subjects of property and of compensation."

And the only logical conclusion to be reached from the following quotation from the opinion of this Court in *Brown* v. *DeNormandie*, supra, would be that full compensation must be made for any property or property right destroyed or diminished under the Mill Act.

"Here again we must go to the statute to ascertain what power is given and what exceptions are made. As to the power given, it is to flow the 'lands' of any person, and the only exception is an existing mill or 'any mill site on which a mill or mill dam has been lawfully erected and used, unless the right to maintain a mill thereon has been lost or defeated.'

"The word 'lands' is not confined to field or meadow. Under Rules of Construction, R. S., Chap. 1, Sec. 6, Par. X, 'the word "land" or "lands" and the words "real estate" include lands and all tenements and hereditaments connected therewith, and all rights thereto and interests therein.' This includes buildings and improvements on the land as well as the land itself. The only exception to this broadly inclusive term is other manufacturing industries on the same stream. This exception did not arise until the revision of 1841, at the same time when the element of necessity dropped out. The evident purpose of both the omission of necessity and the addition protecting other mills on the same stream was the encouragement of manufacturing industries and the injury of none. No other class of private property is exempt from the provisions of the Act. The maxim 'Expressio unius est exclusio alterius' may be pertinently invoked."

The Massachusetts rule, so-called, is based upon a conception of the common law, prevalent up to the publication of *Tyler* v. *Wilkinson*, supra, discarded since by the courts both of England and America, and negatived by Chancellor Kent. Our Court questioned the doctrine in its earliest decisions. In *Blanchard* v. *Baker*, 8 Me., 253 (1832), commenting on the opinion in *Hatch* v. *Dwight*, 17 Mass., 288, the Court said, "The right, however, arising from mere prior occupancy, to this extent, has not been held as exclusive, unless continued for twenty years. *Platt* v. *Johnson*, 15 Johns., 213;

*Tyler* v. *Wilkinson*, 4 Mason, 397." And in *Butnam* v. *Hussey*, 12 Me., 407 (1835) : "A riparian proprietor on one side, or above or below, may use the water, or avail himself of its momentum, and may for this purpose create a head of water; provided he does not thereby impair the rights of other proprietors. If he thereby injure or destroy a privilege previously appropriated, he may be held answerable, although the mill or mills, depending on such privilege, may be out of repair, have gone to decay, or been destroyed by flood or fire, unless the same has been abandoned by the owner. *Hatch* v. *Dwight et al*, 17 Mass., 289. There an action was sustained for impairing a water power, the actual enjoyment of which by the owner had been sometime suspended. It may admit of more question, whether an action could be maintained by the owner of a privilege, which had never been occupied, for the erection of a dam below, which may have impaired or destroyed its value. There are authorities which sanction the doctrine, that the first occupant thereby acquires exclusive rights, which can not be affected by operations upon the stream above or below. Of this opinion was Parker, C. J., by whom the opinion of the court was delivered in the case before cited. At a subsequent period, Story, J., in the case of *Tyler et al* v. *Wilkinson et al*, 4 Mason, 397, after an elaborate view of the authorities in England and in this country, maintains the opinion that such exclusive right is not sustained by occupancy alone, for a period short of twenty years. The weight of authority appears to be with Mr. Justice Story."

That the Mill Act conferred no rights which did not exist at common law, as stated in *Fuller* v. *Chicopee Mfg. Co.*, supra, was expressly denied in *Jordan* v. *Woodward* (1855), supra, in which Justice Rice, speaking for the Maine Court said, "In direct terms the power is conferred upon the mill owner, by the statute, to erect and maintain a dam to raise water for working his mills, and incidental to this power is the right to overflow the lands of other persons, or to speak more accurately, this power of building dams may be exercised, though incident thereto, the lands of other persons be overflowed and injured. This right is in derogation of the common law, and the natural right of the citizen, and should not therefore be extended by implication."

It appears then that neither in 1832, 1835 nor 1855 had our

Court adopted the view that the rule of the court of Massachusetts concerning riparian rights was binding upon the court of Maine.

The assumption that our Court recanted and adopted a different theory in *Lincoln* v. *Chadbourne*, 56 Me., 197, is not borne out when the opinion in that case is analyzed. There was no issue presented in that case which called for any expression of the court as to the common law rights of riparian owners. It is, of course, true that proprietors of the earlier dam, erected under the Mill Act, gain prior rights to the flow of the stream; and it is likewise true that if in the exercise of these prior rights the property of another is destroyed or diminished in value, compensation may be recovered for the injury. If the language of this opinion is construed as negativing the latter proposition, it is pure dictum. There was nothing before the court calling for a decision on that point.

As stated above, the Massachusetts decisions rest not only upon a different view of the common law from that assumed by Story and Kent and now agreed to universally outside of that state but also upon the premise that the Mill Acts are merely declaratory of the common law. Maine, in accordance with the view uniformly adopted elsewhere, holds the Mill Act in derogation of the common law and hence to be strictly construed. Denying that the doctrine of prior occupancy confers prior rights at common law, it is and must be considered that such rights are granted only by the statute and that they can not be extended beyond the terms thereof.

By the terms of the Mill Act, the prior occupant is given the right of eminent domain. He may exercise it. He may take for his use the property of his neighboring riparian owner, if it is necessary for his purposes, but he can not do so without compensating him therefor. He may flow the land of another but he must recompense the owner of the land to the full value thereof, and if that value is enhanced by the fact that inseparably connected with it and part and parcel of it are riparian rights, those rights must be considered in arriving at its value.

The rule of damage must be the difference between the value of the land before the flowing and afterwards. No other rule can be applied without violating every sound principle of law. Under that rule, riparian rights must be considered. Such rights are "as certain, as absolute, and as inviolable as any other species of property

and constitute a part of the land as much as the trees that grow thereon or the mill or the house that he builds thereon. He can be deprived of them only through the power of eminent domain constitutionally exercised." Opinion of the Justices, supra.

The sole duty of commissioners before whom this complaint is to be heard is to determine the diminution in the value of complainants' land, caused by flowage from defendant's dam. In arriving at that conclusion, they must accept the definition of the word "land" according to the statutory rule of construction; in other words, they must include all "hereditaments connected therewith and all rights and interests therein." They must consider its location and keep in mind that its "capacity for power development is an element of value to be considered." They must remember that "the element or elements of value which lead to the most profitable form of improvement fixes the proper valuation."

They must have in mind that "land upon the bank of a river and in its bed where there is a fall and adjacent land adapted for flowage may have a largely increased worth in the market by reason of those characteristics which may be available for valuable use in different ways and that the valuable uses to which the land may be put, including that of developing the capacity of the river for power, should be considered in estimating its fair cash value."

They must be guided by the rule that "one whose land is taken by eminent domain is entitled to be compensated in money for the fair value in the market of that of which he has been deprived and in ascertaining that value, all of the uses to which the property is reasonably adapted may be considered." They must follow the rule of damages that the complainant is entitled to the difference between the value of the property before the building of defendant's dam and afterwards.

They should be reminded of the provision of our State Constitution that "private property shall not be taken for public purposes without just compensation and only when the public exigencies require it"; and that, although our Court has somewhat reluctantly consented to regard the improvement of our rivers by the building of power dams as a public purpose, in view of the long acquiescence in that theory and the vested property rights acquired under it, it has never gone so far as to even intimate that in the face of

the constitutional provision, the owner of the land taken is not entitled to "just compensation."

Unless all of these factors are considered by the commissioners, injustice to the complainants must result. The chief value of the land taken may be "that it has a privilege upon it." Its value may be "greatly enhanced by the fact that its topography is such that a dam may be maintained across a stream upon it and water power thereby created."

The ruling below excludes all evidence on these various matters. It forbids their consideration by the commissioners. If sustained by this Court, it forces one of two conclusions—either that riparian rights are not property, a position never yet taken by any court; or that, under the Mill Act, private property may be taken without just compensation, thus irrevocably stamping that ancient statute as not of doubtful constitutionality but of undoubted unconstitutionality. Apparently the sole excuse for accepting such a theory,—condemned by Story and Kent, rejected by the courts of England and by the courts of every American state which have considered the subject with the exception of Massachusetts, denied by Angell, Gould, Farnham and all other standard text-writers,—is that, based upon an obsolete view of the common law, the Massachusetts court adopted the rule for which defendant contends.

In the face of precedent, logic, reason, and a decent regard for the rights of private property owners, such a ruling should not stand. Complainants' exceptions should be sustained.

DUNN, J., concurring in dissent.