CENTRAL MAINE POWER COMPANY

*vs.*

INHABITANTS OF THE TOWN OF TURNER.

Androscoggin.　　　Opinion February 6, 1930.

*W. B. & H. N. Skelton,*
*Everett H. Maxcy,*
*Nathaniel W. Wilson,* for appellant.
*Clifford & Clifford,* for appellee.

SITTING: DEASY, C. J., DUNN, STURGIS, BARNES, PATTANGALL, JJ. PHILBROOK, A. R. J.

STURGIS, J.  This appeal from the decision of the Assessors of the Town of Turner, refusing to abate the tax assessed for the year 1927 against the appellant, is reported to this court for final decision upon an Agreed Statement of Facts. The regularity of the assessment of the tax and the sufficiency of the appeal are conceded. The appellant's single claim of abatement is directed to the appraisement of its property for purposes of taxation.

As of April 1, 1926, the Power Co., appellant, owned two mill privileges extending along the westerly channel of the Andros-

coggin River in the Town of Turner. The upper privilege, known as Clark's Rips, had not been developed, but at the lower privilege, called the Babbit and Googin dam-site, there was a dam and actual power development. These privileges, as here admitted for the purposes of this case, then had a just value for purposes of taxation of $200,000, and were so assessed in the tax levy of that year.

Some time during the year following this assessment of 1926, the Power Co. completed the construction of its new hydro-electric plant on the Androscoggin River, below Turner, and in the cities of Auburn and Lewiston. The new dam, known as Gulf Island Dam, with a crest elevation not exceeding 260 feet above mean sea level, flowed back the waters of the river along the appellant's land in Turner, flowing out the Clark's Rips and Babbit and Googin privileges so that, at the date of the 1927 assessment, there was no fall of water and neither privilege, as then submerged, could be used as the site of a dam. Power in excess of all power which could have been developed at the Clark's Rips privilege or had, or could have been, developed at the Babbit and Googin dam-site was developed at the Gulf Island Dam, and in the cities of Auburn and Lewiston.

April 1, 1927, the Assessors of Turner again assessed Clark's Rips and the Babbit and Googin dam-site as mill privileges, denying the right of the appellant to a reduced valuation because of its impairment, or, as it says, the destruction of the present utility of these sites for power development.

The appellant concedes that its land and riparian rights should be assessed in Turner for their greatest value under present conditions, but contends that their value now lies in their use for storage or pondage purposes as a part of the reservoir created by Gulf Island Dam. The Town of Turner claims that the value of the capacity of these privileges for the development of water power should still be included in their valuation.

The question of the taxation of water power, as such or as an element of value incident to other property, first came before this court in *Union Water Power Co. v. Auburn*, 90 Me., 60. In that case the Assessors of the City of Auburn attempted to assess a tax on the water power developed by that part of a dam across the Androscoggin River, between Auburn and Lewiston, which lay within the limits of Auburn. The assessment was laid upon "dam

and water rights." The power created by the Auburn end of the dam, as well as that created on the Lewiston side of the river, was used to operate mills in Lewiston. This court there held, as it now holds, that water power is not a distinct subject of taxation, and expressed the opinion that water power is taxable only in connection with, and as incident to, the mills which it operates.

Six years later, in 1903, *Saco Water Power Co.* v. *Inhabitants of Buxton*, 98 Me., 295, came before the court. In that case there was a dam and a privilege but no mill. The power was developed but not used. Under the authority of *Union Water Power Co.* v. *Auburn*, the contention was made that, there being no mill operated by the power developed, the assessors could only include in their valuation the land through which the stream ran for what it was worth as land, independent of its appurtenant mill privilege, and the dam for what that was worth as a structure. The court held that, in so far as the land was made more valuable by the stream and fall upon it, so far these elements of increased value were to be considered in the valuation of the land. In reaching this conclusion the Court said:

"Suppose there was no dam. Could it be successfully contended that the land was to be assessed only for its value as land for farming, or for any other use to which it might be put disconnected from the stream? Is land upon which there is a valuable unimproved water privilege, where no power is being developed, to be assessed only for the value of the land without the privilege? May it not be the chief value of the land that it had a privilege upon it? And does the fact that an unused dam has been built upon the privilege, make it any other than an unused privilege, and assessable for its value as a privilege? We think not."

In 1904, the *Union Water Power Co.* v. *Auburn* case again came up for consideration by this court. In *Penobscot Chemical Fibre Co.* v. *The Town of Bradley*, 99 Me., 263, the Fibre Co. was the owner of the entire privilege in the Penobscot River as it flows between Old Town and Bradley. By a dam there constructed, a water fall of 2,000 horse power was created, practically all of which, not running to waste, was used to operate the Fibre Company's pulp

and sawmills in Old Town. The power used at Bradley to operate a small cutting-up mill was of small amount. The assessment by the Town of Bradley, complained of, was upon a "mill privilege." The appellant, relying upon the *Union Water Power Co.* v. *Auburn* case, contended that, in as much as practically all the water power created by the dam was used in Old Town to operate the mills located there, the Bradley power privilege should be regarded as appurtenant to the Old Town mills and not included as an element of value in the assessment of the Fibre Company's Bradley property. This court then said:

"The true rule was laid down and the distinction pointed out in *Saco Water Power Co.* v. *Buxton*, 98 Me., 295. Running water is not property, and is not taxable. So water power, as such, is not taxable. It was so decided in the Auburn case. But land upon which a mill privilege exists is taxable and the value of the land may be greatly enhanced by the fact that its topography is such that a dam may be maintained across a stream upon it and water power thereby created. The capability of the land for such use and the probability of certainty, as the case may be, of its use certainly affect its value. Such is the law of the Buxton case. The question here is a simple one. It is not, where is the water power created by the Appellant's dam used, but how much is its property in Bradley worth. How much is it worth as it stands, — not for farming merely, nor for house lots, nor for any one thing, but for any and all purposes for which it may be used? How much is it worth, taking into account that it is part of a valuable mill privilege, — one of the best on the Penobscot River, as witnesses on both sides say, — and upon which valuable water power is created? Although the power is used mostly in Old Town, and Bradley bank is just as essential to the creation of water power as that in Old Town. One is worthless without the other. If it did not own the Bradley shore, the Appellant must share the use of the water with the riparian owner on that side. It may be that the Bradley shore is not as valuable as the Old Town shore, for it may be assumed that the latter is more available as a mill site, and perhaps also for other uses.

Nevertheless, it is not to the purpose to make a comparison of the values between the two sides. We come back to the original question, — what is the company's property in Bradley worth, taking into account all the conditions which affect its value?"

The inclusion of the value of the mill privilege as an element of value in the land, to which it was incident, was sustained.

In *Shawmut Manufacturing Co.* v. *Town of Benton*, 123 Me., 121 (1923), the rule of the Buxton case and the Bradley case was followed, and an assessment upon that part of the dam, the damsite and its incident water privilege, situated in Benton, was sustained although the power developed was applied in Fairfield, across the river.

What is the rule for the valuation of water privileges and water power to be deduced from these decisions of this court? It is this. Water power, as such, is not an independent subject of taxation. But land upon which a mill privilege exists is taxable at its worth as land enhanced by the value of its capacity for water power development, or to use the language of *Fibre Co.* v. *Bradley*, by the value of "the capability of the land for such use." If the privilege is undeveloped or, developed, is not utilized, the capacity of the land for power development, often termed its "potential development," is nevertheless an element of value to be considered in its tax valuation. As was said in *Water Co.* v. *Buxton*, the chief value of a parcel of land may be that it has a privilege upon it, and, in so far as the land is made more valuable by the stream and fall within its limits, so far these elements are to be considered in its valuation.

Again, if, in the development of a stream, the head of water created by the dam is utilized to produce power only on one side of the river, the privilege on the other bank, furnishing a foundation for one end of the dam and a reservoir for its waters, and a contributing factor in the development of power by the dam, still retains a "capability" for power development which is an element of value in the land to which it is incident. *Fibre Co.* v. *Bradley*, supra; *Manufacturing Co.* v. *Benton*, supra.

. It is a failure to distinguish the capacity of land to develop water power from water power when produced, we think, that has brought some apparent confusion into judicial expression upon

this subject. Water power may be utilized in places far remote from the site of its creation. Its use in the operation of mills at or distant from the water fall which produces it may properly increase the value of the mills receiving the power and subject them to taxation accordingly. But the land in which the stream falls still retains its appurtenant capacity for power development, an element of value distinct from water power as such, and not lost by a transfer of the power elsewhere.

In *Slatersville Finishing Co.* v. *Green et al,* 40 R. I., 410, a case in which the physical situation involved was practically identical with that in the case at bar, this distinction between the "capacity" of land for power development and power itself is recognized. That court says:

"If land upon a stream has such topography, either natural or artificial, as to give to the land the capacity to control the current of the stream and to pour out the water of the stream from an elevation, thus creating water power, these circumstances enhance the value of that land and furnish a basis for taxation. This is true whether that capacity is employed to create water power to be used on that land or upon other land in another town or another state, and also even in case such capacity of the land is not employed at all. If water power thus created is conducted to mills situated elsewhere, and there applied, that circumstance may reasonably be regarded as increasing the value of the mills receiving such power and may be considered in the taxation of such mills; but no element of value is thereby taken from the land, where the power is created and transferred and made appurtenant to the mills where the power is used."

The same distinction is a sustaining reason for the conclusion reached in *Blackstone Manuf. Co.* v. *Blackstone,* 200 Mass., 82. In that case a power privilege in Blackstone, a town in Massachusetts, furnished power for the operation of mills just across the state line in Rhode Island. And while due consideration was given to the fact that the privilege was in one state and the mill in another the assessment upon the privilege, including as an element of its value the right to use the flow of the waters in connection

with the fall of the stream to produce power, was sustained. The Maine cases of *Power Co.* v. *Buxton* and *Fibre Co.* v. *Bradley*, interpreted to hold "that, while water power as a distinct subject for taxation could not be assessed except in connection with the property with which it was used, the land and fall and dam were properly assessable in reference to their value as a means of producing power," were cited in support of this decision.

An adherence to the same principle is found in New Hampshire. In *Manufacturing Co.* v. *Gilford*, 64 N. H., 337, 349, that court in a consideration of the taxation of a reservoir site used to supply power for mills on the stream below said:

"It is immaterial where the property benefited by the use of the reservoir rights is situated. The rights are not less a parcel of the Gilford lands, in case their exercise is beneficial to mills in Massachusetts, than they would be if they were used and controlled for the sole benefit of mills in Gilford. It may be that the value of the mills in Massachusetts is increased by the existence of the reservoir rights, and that of the rights by reason of the existence of the mills. If so, and if each property is appraised for taxation at its full value, it does not follow that any portion of either property is included in the valuation of the other."

But the appellant says the capacity of power development of its privileges in Turner is destroyed by the back-flow of Gulf Island Dam. We can not accede to that position. The capacity of an undeveloped privilege for power development lies in the topography of the land and the character of the stream. Failure to build a dam, or the location of an unused dam upon the land, leaves an unused privilege assessable, however, to the extent the land is "made more valuable by the stream and fall." *Power Co.* v. *Buxton.* In principle, we think, it is equally an unused privilege when submerged by its owner. The capacity of the land to produce power is suspended so long as the waters of the stream are dammed from below. At the election of its owner, the land is used for storage purposes, admittedly, in the case at bar, a less profitable use than for the development of power. We do not think the land owner can thus fix the value of his taxable property. To so hold would permit

a riparian owner, having a dam below, to convert his upper privileges into less valuable storage basins for the day of assessment of taxes and reconvert them into more valuable power privileges the day following. It is not an accepted doctrine that the tax payer can fix the value of his land for the purposes of taxation by the use to which he puts it.

This conclusion accords with the "most profitable use" rule. It is conceded by the appellant that the "land is taxable according to the greatest value it possesses." This is the principle underlying the rule that, in estimating the value of land for purposes of taxation, all of its incidents should be considered and the elements of value which lead to its most profitable improvement fix the proper valuation of the land. The owner may not see fit to improve his land at all. He may put it to uses which are less profitable than others for which it is suited. But he can not thereby lessen its valuation for the purposes of taxation and deprive the assessors of taxes of the right to assess it upon a valuation based upon its highest profitable use. The common illustration of this rule is the city lot on the principal street of a large city. The owner may permit it to remain unimproved. He may use it for a purpose or in a manner which produces little or no return but its valuation is based, not upon its present use, but upon its favorable location and worth for building purposes. 26 R. C. L., 365.

This is the rule in *Slatersville Finishing Co.* v. *Green et al*, supra, where that court also said:

"The value of land depends upon its capacity for improvement. The elements of its value may be its fertility, the minerals in its soil, its location, the configuration of its surface, and many other circumstances one or more of which may be incident to a certain tract of land. In estimating its value for the purposes of sale or of taxation, all of these incidents should be considered and the element or elements of value which lead to the most profitable form of improvement fixes the proper valuation of the land,"

and held that a privilege flowed out by a dam below is taxable at its value for use as a privilege and not as a storage basin or reservoir. See also *Blackstone Mfg. Co.* v. *Blackstone*, supra.

By the terms of the Report, the unused and undeveloped privileges owned by the appellant in Turner, before they were flowed out, had a taxable value of $200,000. Used as a part of the reservoir or pond of Gulf Island Dam, their value is $60,000. Their most profitable use is as mill privileges. They are taxable accordingly.

The tax assessed in 1927 was at the rate of forty-five mills upon the valuation made and aggregated the sum of $10,296. The valuation placed upon privileges of the appellant that year was $227,000. This valuation, by stipulation, must be reduced to $200,000 and other items aggregating $1,800 not being contested, the tax assessed by the Town of Turner upon the property of the appellant for the year 1927 abated accordingly.

And, it not appearing that the appellant has paid the taxes so assessed, judgment must be rendered for the Town of Turner in the sum of $9,081 with costs.

> *Judgment for the Appellee against the Central Maine Power Co., Appellant, for $9,081 with costs.*