CITY OF BANGOR *vs.* CITY OF BREWER.

Penobscot.     Opinion, January 7, 1946.

*Benjamin W. Blanchard,* for the plaintiff.

*Chester A. Robinson,*

*Michael Pilot,* for the defendant.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, MURCHIE, JJ., CHAPMAN, ACTIVE RETIRED JUSTICE.

MANSER, J., DISSENTS.

MURCHIE, J.    This case originated in an application for abatement of a tax assessed for the tax year commencing April 1, 1944, filed with the assessors of the City of Brewer by the City of Bangor pursuant to R. S. 1930, Chap. 13, Sec. 73, as amended. The language of the statute, giving effect to all amendments adopted prior to the filing of the application, appears in R. S. 1944, Chap. 81, Sec. 39. The application being denied, the City of Bangor took an appeal to the Superior Court in accordance with subsequent provisions of the statute. See. R. S. 1930, Chap. 13, Secs. 76, 77 and 78 (now R. S. 1944, Chap. 81, Secs. 42, 43 and 44). Decision there was favorable to the City of Bangor and the cause is brought here by exceptions filed on behalf of the City of Brewer as authorized by R. S. 1930, Chap. 13, Sec. 79 (now R. S. 1944, Chap. 81, Sec. 45), which allege that it is aggrieved by the judgment and that the decree entered below contains multiple erroneous findings.

Each such finding can be segregated from the language of the decree but analysis of them discloses that basically and collectively they charge error in a single finding that part of the taxed land is "a reservoir and a dam used only for reservoir purposes" and a ruling that that part, with its appurtenant mill privilege, is exempt from taxation under R. S. 1930, Chap. 13, Sec. 6, Par. I (now R. S. 1944, Chap. 81, Sec. 6, Par. I). The quoted words are substantially those used in the statute. There can be no doubt of the accuracy of the finding that from the down-river limit of a dam anchored on the shore to the up-river limit of the parcel that shore and the land under the dam and the impounded water are used by the City of Bangor to maintain a reservoir for the dual purposes of supplying water to its inhabitants and generating electricity for its municipal use. The issue presented by the exceptions relates solely to the ruling that all that part of the land and that between the highway and the river up-stream from a line drawn to the highway in continuation of the down-river limit of the dam constitutes a separate parcel which is exempt from taxation.

The dam extends across the Penobscot River from the Bangor shore to the taxed land, which comprises five acres according to the testimony but is assessed as seven. The tax valuation is $25,000. The decision finds it overrated by $24,000 but this results from the finding that a part of it is exempt from taxation. There is no finding as to its value as a mill privilege but we must pass upon the exceptions on the assumption that the valuation is proper if the property is taxable. The record contains no evidence to establish the value of the property as riparian land but one of the assessors of the City of Brewer, called as a witness by the appellant, testified that without reference to its shore location it had a tax value of $25 or $30 per acre. The difference is not material. A plan introduced in evidence shows that the dam is anchored to the taxed land at a point approximately midway between its up-river and down-river limits. The findings make it apparent that the part declared non-taxable includes approxi-

mately half the total unsubmerged area. For convenience we shall refer to the parts hereinafter as the up-river half and the down-river half. Neither the dam nor the reservoir is taxed as such and the tax valuation must be considered as relating to an approximate $200 for the land without reference to its shore location (the range would be from $125 to $210 depending on the true acreage and the use of the lower or higher valuation figures stated by the assessor) plus $24,800 or thereabouts for an increment of value traceable to its capacity for use as a site for the development of water power. The Justice who heard the appeal declared that the shore privileges of the down-river half did not add much to its value, which he fixed for tax purposes at $1,000. This must be considered as representing about $100 without reference to the shore and something like $900 for shore privileges other than the mill privilege which was declared appurtenant to the up-river half.

The issue presented is the taxability of the up-river half and its mill privilege, which involves the construction of the consolidated effect of R. S. 1930, Chap. 13, Secs. 2 and 3 and the first sub-paragraph of the following Sec. 6 (now found in the corresponding sections of R. S. 1944, Chap. 81) or, perhaps, nothing but the latter since the first two have the undoubted effect of subjecting all real estate within the state to taxation unless exempted therefrom by the third, wherein nothing but the first sub-paragraph relates to publicly owned property. Secs. 2 and 3 may be considered as having remained on our statute books unchanged for the purposes of this case in more than a century. They were enacted originally as P. L. 1845, Chap. 159, Secs. 2 and 3. The language of Sec. 3 has been amplified from time to time as in 1911 when P. L., Chap. 174, Sec. 2 made specific provision that "water power, shore privileges and rights" and other items should be taxable as real estate, but this was declaratory of existing law rather than an enlargement of the provisions of the statute. See the cases cited infra relative to the taxation of water power.

10

The legislation under which the City of Bangor maintains and operates the water system which supplies its inhabitants with water and electricity for its own use is found so far as here material in Private & Special Laws as follows: 1875, Chap. 168; 1876, Chap. 260; and 1927, Chap. 73. The dam and reservoir are essential parts of the water supply system established under the legislative authorization of the 1875 and 1876 laws, as are the power house, located entirely in Bangor, and a part of the machinery with which it is equipped. The additional machinery is equally essential for the municipal electric power and light plant. From the very beginning it was contemplated that any surplus of either water or power might be leased or sold but the question whether the authorization was ever used is not material. Since sometime prior to 1925 (see the dates of installation of water wheels infra) the entire property has been used by the City of Bangor. The 1927 law cited *supra* authorized the Water Board to take over an electrical department created by municipal ordinance and carries a necessary implication that it was then in full operation. The capacity of the water wheels or turbines and settings on April 1, 1944, was 850 kilowatts. A single 200 k.w. unit installed in 1898 supplied the power used in connection with the water supply system. Two other units with a combined capacity of 650 k.w. were used to generate electricity for municipal use. One was installed in 1925 or two years prior to the 1927 legislation, the other in 1931.

Prior to the enactment of P. L. 1911, Chap. 120, the City of Brewer could have imposed no taxes on the property of the City of Bangor within its limits which was appropriated to public use. Prior to the effective date of P. L. 1903, Chap. 46, the same thing was true regardless of the use to which it was devoted. Since 1845 the law defining real estate for tax purposes has been couched in language as general as that now in effect. See P. L. 1845, Chap. 159, Secs. 2 and 3 and the corresponding sections of our periodic statutory revisions of 1857, 1871 and 1883. Until 1903 no publicly owned property was declared exempt from taxation except

that belonging to the United States and the State of Maine. Yet it was decided in 1885 that a building owned by a public municipal corporation was free from tax burden because taxation was applicable to private property only. *Inhabitants of Camden* v. *Camden Village Corporation*, 77 Me., 530, 1 A., 689. The plaintiff contended in that case that the statute was so definite as to leave no room for judicial construction and that all property not falling within the defined exemption was taxable. This claim was rejected on the authority of many text writers and decided cases cited in the opinion. The decision is of great importance in the development of our law on the subject matter because the defendant was classified as a "public municipal corporation" and that term was adopted by our Legislature in amending the statute.

Disregarding an amendment in P. L. 1941, Chap. 183, which has no bearing on the present question, the purpose and effect of R. S. 1930, Chap. 13, Sec. 6, Par. I, can be determined best by a consideration of its piecemeal development. We quote it in that manner to show how the amendments adopted in 1903 and 1911 affected earlier existing law. The section provides that the property and polls defined in its sub-paragraphs "are exempt from taxation." Only the first of those sub-paragraphs applies to publicly owned property. The first clause has remained unchanged from the time of its original enactment as P. L. 1845, Chap. 159, Sec. 5, Par. First. From 1845 to 1903 it read:

"The property of the United States and of this State."

P. L. 1903, Chap. 46, added:

"and the property of any public municipal corporation of this state, appropriated to public uses,"

and P. L. 1911, Chap. 120:

"if located within the corporate limits and confines of such public municipal corporation, and also the pipes, fixtures, hydrants, conduits, gate-houses, pumping stations, reser-

voirs, and dams used only for reservoir purposes, of public municipal corporations, engaged in supplying water, power, or light, if located outside of the limits of such public municipal corporations,"

with a proviso safeguarding the right of any city or town to tax property without reference to its terms if authorized to do so by special legislation. As the bill which effected this last amendment was presented to the Legislature it would have added nothing except the phrase "if located within the corporate limits and confines of such public municipal corporation." This would have made all property owned by a municipality outside its limits taxable. The Legislature in its wisdom determined to exempt certain items of property so situated if devoted to particular uses and proceeded to list them in a careful manner and enumerate the uses.

Decision in *Inhabitants of Whiting* v. *Inhabitants of Lubec,* 121 Me., 121, 115 A., 896, was handed down some years after the statutory revision of 1916, where the provision now controlling appears as Chap. 10, Sec. 6, Par. I, although the references in the opinion are to the session laws rather than to the revision. Once again the entire subject matter of the taxation of publicly owned property was reviewed with the result that in view of the 1903 and 1911 amendments this Court adopted the construction which it had rejected in deciding, *Inhabitants of Camden* v. *Camden Village Corporation,* supra. It recognized as that case had declared that the:

"public property of the state and that of its governmental divisions is presumptively immune from taxability"

but that the immunity did not result from a want of legislative power to impose taxation on some publicly owned property at its election and construed the law as then phrased as an exercise of that power subjecting the property of one municipality situate in another to taxation unless expressly exempted.

*Inhabitants of Whiting* v. *Inhabitants of Lubec*, supra, decided definitely that land did not come within the defined exemptions and that the real estate of one municipality situate within the confines of another should be taxed therein on the tax valuation applicable to private owners, i. e., with recognition of any increment traceable to its availability for development as a mill privilege. *Union Water Power Co.* v. *City of Auburn*, 90 Me., 60, 37 A., 331, 37 L. R. A., 651, 60 Am. St. Rep., 240; *Saco Water Power Co.* v. *Inhabitants of Buxton*, 98 Me., 295, 56 A., 914; *Penobscot Chemical Fibre Co.* v. *Inhabitants of Bradley*, 99 Me., 263, 59 A., 83; *Central Maine Power Co.* v. *Inhabitants of Turner*, 128 Me., 486, 148 A., 799.

The decision below must be assumed to have been made on the theory that a mill privilege flowed out by the erection of a dam at its site was so engulfed or absorbed into the reservoir created thereby as to lose both its identity and inherent character. This is contrary both to *Inhabitants of Whiting* v. *Inhabitants of Lubec*, supra, where the municipality owning the property was held liable for taxes on land and mill privilege used in connection with its water and electric supply system but also to *Central Maine Power Co.* v. *Inhabitants of Turner*, supra, where a private owner was held for a tax based on a valuation of land which recognized its appurtenant mill privilege although the privilege had been flowed out by a lower riparian development. The only ground on which it can be claimed that the present facts are distinguishable from those presented in the *Central Maine Power Co.* case, supra, is that the privilege here in question has been engulfed or absorbed into a reservoir which is not taxable. That fact does not distinguish the case from *Inhabitants of Whiting* v. *Inhabitants of Lubec*, supra. The consolidated effect of the two cases is that land is not exempt from taxation under R. S. 1930, Chap. 13, Sec. 6, Par. I, and may be valued for tax purposes with due regard to an appurtenant mill privilege although the latter is not currently usable because of water impounded upon it. That the dam which

impounds the water stands upon the land which carries the privilege rather than at a lower riparian location or that the reservoir created by the dam is exempt from taxation is not material. The ruling complained of constitutes error and the exceptions must be sustained.

The application for abatement entitles the appellant to relief if the tax valuation involved is in fact excessive. It should not be precluded from offering testimony on this point and the case is remanded for further action in recognition of that right.

*Exceptions sustained.*

## DISSENTING OPINION

MANSER, J.   I regret that I cannot concur. The Penobscot River, in its passage to the sea, flows between the cities of Bangor and Brewer. In this area there existed a natural waterfall suitable for development of water power. Bangor became the riparian owner of land on both sides of the river at this point, and erected a dam reaching from bank to bank. It was thus enabled to develop hydro-electric power for the municipal purpose of supplying the city with electric lights. As stated in the majority opinion, it has long been recognized in this jurisdiction that public property of the state and that of its governmental divisions, is presumably immune from taxation. The legislature has power, however, to restrict this immunity, and the present existing exemptions are to property of any municipal corporation appropriated to public uses, located within its corporate limits, and also the

"pipes, fixtures, hydrants, conduits, gatehouses, pumping stations, reservoirs, and dams used only for reservoir purposes of public municipal corporations and engaged in supplying water, power and light, if located outside of the limits of such municipal corporation."

Brewer assessed a tax on *land* owned by Bangor, said to contain seven acres, and lying between the river and a named highway. The valuation for the tax levy was $25,000. It was developed in the record that the land itself was rough and uncultivated, and it was valued by the presiding justice who heard the case, at $1,000. The court below ruled that so much of the dam and reservoir as was within the territory of Brewer was exempt from taxation under the express provision of the statute, and reduced the valuation by $24,000.

The majority opinion, evidently constrained thereto by the decision in *Whiting* v. *Lubec*, 121 Me., 121, 115 A., 896, holds in effect, that although the dam and reservoir are exempt from taxation, yet the property constitutes a "mill privilege" so-called, and as the statute did not expressly contain this term, the entire property including the dam and reservoir was taxable as such a mill privilege for its highest actual and potential value as such, in accordance with the rule when property of that nature is owned by private interests.

As noted in *Bean* v. *Power Co.*, 133 Me., 9, at page 20; 173 A., 498, at page 503:

"Mill seat, now mill site, and mill privilege have been household words of the people served by power dams on streams since the mud-sill of the first dam was seated in the territory now the State of Maine, for full three hundred years.

"The terms are synonymous, used interchangeably to name a location on a stream where by means of a dam a head and fall may be created to operate water wheels."

and we may now add to create hydro-electric energy to produce electricity.

It would seem that the logic is unassailable that a dam and the reservoir thereby created, the bed of the river and the banks which surround it, are also synonymous with "mill privileges." As above noted, it is held by the majority opinion that the dam and

reservoir are not taxable, yet the mill privilege, which is formed by the combination, is taxable at its full commercial value. In the judgment of the writer, it was plainly the intention of the legislature to exempt the very things which make a mill privilege. To hold that the dam and reservoir are not taxable but the city must pay for the "privilege," is looking through a glass darkly, and does not reflect legislative intent.

I am in full accord with the doctrine of *stare decisis*, but I cannot believe that there should be slavish adherence thereto when thereby a misconception will result in perpetuation of error and a nullification of the purpose of the legislation. There are no vested rights which will be uprooted, no procedural practices which will be upset, no uncertainty will result, and instead of tending to defeat justice in the present case, it will uphold it for the benefit of the citizens of Bangor, who should not be compelled to contribute to taxes levied against the city without right under the law.

*The exceptions should be overruled.*